**EXHIBIT A**

Approved, SCAO

Original - Court
1st copy - Defendant
2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| 6th | **JUDICIAL DISTRICT**<br>**JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS** | 2022-192350-CB<br>22-    -CB<br>JUDGE MICHAEL WARREN |

**Court address**
1200 N. Telegraph; Pontiac, MI 48341

**Court telephone no.**
248.858.0345

**Plaintiff's name(s), address(es), and telephone no(s).**

Jennifer Van Vallis-Bright

v

**Defendant's name(s), address(es), and telephone no(s).**

Scripps Media Inc.

AGENT:
CSC-Lawyers Incorporating Service (Company)
2900 West Road Ste 500
East Lansing, MI 48823

**Plaintiff's attorney, bar no., address, and telephone no.**
Benjamin Low (P82834)
Jaffe Raitt; 27777 Franklin Rd., Ste. 2500
Southfield, MI 48034; (248) 351-3000
benlow@jaffelaw.com

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☒ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.    **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:

1. You are being sued.

2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).

3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date * | Court clerk |
|---|---|---|
| 2/2/2022 | 05/04/2022 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**MC 01**    (9/19)    **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED    Received for Filing    Oakland County Clerk    2/2/2022 1:32 PM

| **PROOF OF SERVICE** | **SUMMONS** | |
|---|---|---|
| | Case No.   22-        -CB | |

TO PROCESS SERVER:  You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons.  You must make and file your return with the court clerk.  If you are unable to complete service you must return this original and all copies to the court clerk.

### CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:    (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), that:    (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____

List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | **TOTAL FEE** | Name (type or print) |
| $ | | $ | $ | |
| | | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.

Date

My commission expires: _____   Signature: _____

Date                                                    Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

### ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____

Attachments

_____ on _____

Day, date, time

_____ on behalf of _____ .

Signature

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

Case 2:22-cv-10227-FDB-Cr ECF No. 1-1, PageID.8 Filed 02/03/22 Page 3 of 57

FILED   Received for Filing   Oakland County Clerk   2/2/2022 1:32 PM

# STATE OF MICHIGAN
# IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
# BUSINESS COURT

**JENNIFER VAN VALLIS-BRIGHT**
an individual,

|  |  |
|---|---|
| Plaintiff, | 2022-192350-CB |
|  | Case No. 22-          CB |
| v | JUDGE MICHAEL WARREN |
|  | Hon. |

**SCRIPPS MEDIA INC.**, a foreign company,

    Defendant.

---

Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351-3000
benlow@jaffelaw.com

---

## VERIFIED COMPLAINT

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in this Complaint.*

*This case meets the statutory requirements to be assigned to the Business Court.*

Plaintiff Jennifer Van Vallis-Bright ("Jenn") through her attorneys, Jaffe, Raitt, Heuer & Weiss, P.C., submits this Verified Complaint against Defendant Scripps Media, Inc. ("Scripps") and alleges as follows:

## Parties, Jurisdiction, and Venue

1.    Plaintiff Jennifer Van Vallis-Bright is an individual who resides in Oakland

1

4865-9168-9738

County, Michigan.

2.     Defendant Scripps Media, Inc. is a foreign company which does business in Oakland County, Michigan.

3.     This matter is within the Court's jurisdiction under MCL 600.605 as it seeks equitable relief.

4.     Venue is proper in this Court under MCL 600.1621.

5.     This action qualifies as a business or commercial dispute under MCL 600.8031.

<u>**General Allegations**</u>

6.     Jenn is the primary breadwinner for her family who rely upon her in order to pay their expenses, including their mortgage.

7.     Without the income that Jenn is able to produce, her family is unable to pay their household expenses, and are unable to pay for their home.

8.     Prior to January 24, 2020, Jenn was negotiating with Scripps for her employment as an Account Executive, for Jenn to have a role in selling television advertisements for one of Scripps' TV stations, WMYD (Channel 20).

9.     On January 24, 2020, Jenn was contacted by Tony Lamerato ("Tony"), the Director of Sales for Scripps, about signing a non-competition agreement with Scripps (the "Non-Compete"). *See* Salesperson Non-Compete Agreement, attached as **Exhibit A**.

10.    Because Jenn was not at home, but was at the hospital due to her father's illness, Jenn asked Tony for more time to get back to him.

11.    Tony was adamant that she would have to sign the document immediately if she wanted to start employment with Scripps the following month.

12.    Jenn could not substantively review or negotiate the Non-Compete's terms or

provisions, which were drafted solely by Scripps.

13.     When Jenn hesitated in responding to Tony, Tony further informed Jenn that Scripps would not stand in the way of her next career move, clearly implying that Scripps regularly released its employees from the non-compete agreements that they signed.

14.     Furthermore, Jenn was aware that Scripps did not enforce its Non-Compete against several individuals whom left Scripps and took several large accounts with them when they formed Standard Wonder Group.

15.     Based on Tony's representations regarding the urgency of her signing the Non-Compete, her knowledge of how Scripps had acted in the past, and Scripps' expressly stated intention to not stand in the way of her future career choices, while she was still at the hospital Jenn used her phone to retrieve the Non-Compete and sign it.

16.     During her employment, from February 2020 through December 2021, Jenn was an exemplary employee for Scripps.

17.     Jenn consistently outpaced her budgets and developed new business for Scripps' television stations, WMYD and WXZY (Channel 7).

18.     In fact, Jenn was awarded the Account Executive of the Year Award for 2020, for WYMD, and would likely have won it in 2021 if she was not involuntarily terminated.

19.     Jenn also volunteered, and was a part of, Scripps' employee leadership community which was formed to help improve employee morale in response to internal employee surveys. As part of that community, Jenn designed and developed an employee recognition program called "The Superhero Awards."

20.     In August 2021, in its response to the covid-19 pandemic, Scripps implemented a vaccine mandate (the "Mandate")

21.     Under Scripps' Mandate, all of Scripps employees were required to be vaccinated by December 1, 2021 – including employees who were not going to the office but who were working on a fully remote basis.

22.     In announcing the Mandate, Scripps' CEO, Adam Symson, stated that the FDA approval of the vaccines should eliminate any opposition to becoming vaccinated.

23.     Symson further stated that "We understand some employees may have a medical reason or sincerely held religious belief for not getting the vaccine, and we will have an accommodation process for those employees." "Otherwise, employees must be fully vaccinated by Dec. 1, even including employees who work 100% remotely. If not, the employee will be in violation of our safety policy, and this will end their Scripps employment."

24.     On September 24, 2021, Jenn requested the medical exemption paperwork from Scripps.

25.     Upon reviewing the medical exemption paperwork it became clear to Jenn that Scripps representation was false and it would not provide a vaccination exemption for any medical condition.

26.     Because Jenn did not have a religious objection to the vaccine and chose not to falsely claim that she had a religious objection to the vaccine, and because she knew that no medical exemption would be provided, Jenn knew that Scripps would terminate her employment.

27.     In reliance on Tony's statements when she began her employment with Scripps, and knowing that her employment would be terminated, Jenn contacted Tony and requested his assistance in obtaining a release from the Non-Compete, so that she could continue to be gainfully employed and be able to support her family.

28.     Tony suggested that Jenn send a formal request to Scripps' HR and Director of

Sales, John Cook, asking him for a formal release from the Non-Compete.

29.     During this process, Jenn found a position with another company in a management, not sales, role that was in radio – which is a significantly different field than television advertising, and that does not compete with television advertising.

30.     Jenn's potential new position would allow her to work remotely, from her home in Clarkston, Michigan.

31.     On October 7, 2021, Jenn provided an alternative non-compete agreement to Scripps, which provided Scripps with even more protections, over a longer time period, than the original Non-Compete that she was forced to sign. *See* Proposed Non-Compete, attached as **Exhibit B**.

32.     On December 3, 2021, Scripps terminated Jenn's employment without communicating to Jenn what she could expect financially, as she had accrued significant sales and commissions. Scripps, also, withheld its determination on her requested release from the Non-Compete until it informed her she was terminated. *See* Termination Letter, attached as **Exhibit C**.

33.     If Scripps had informed Jenn that it would not provide a release from the Non-Compete, Jenn would have likely left her employment with Scripps at an earlier date.

34.     Despite Scripps conduct and inaction, and in full knowledge that she would eventually get terminated, Jenn continued to secure significant sales for Scripps – including, but not limited to, a $325,000 deal from DMCU for both stations for 2022.

35.     Upon her discharge, Jenn spoke with Scripps' HR Director, Tamika Heslip ("Tamika"). Tamika informed Jenn that if she was a finalist for a position, she could email a request for a release from the Non-Compete. Tamika further informed Jenn that she could file and receive unemployment.

4865-9168-9738

36.     Tamika's advice proved to be false, as Jenn did not receive a response from Scripps when she asked about a release from the Non-Compete, and Scripps has challenged Jenn's unemployment application, which has resulted in Jenn being unable to receive any unemployment, creating further financial hardships for Jenn and her family.

37.     On December 13, 2021, Jenn, through counsel, contacted Scripps, explaining how her potential new position would not compete with Scripps and outlining some of the issues with the enforceability of the Non-Compete.

38.     Scripps did not respond to this inquiry until Wednesday, December 22, 2021, where it responded that it "did not have enough information to determine if the noncompete would apply to her new position."

39.     On Monday, December 27, 2021, Jenn, through counsel, provided Scripps with the requested information.

40.     Scripps responded on January 3, 2022, requesting additional information, which was provided on January 4, 2022. Jenn provided further assurances to Scripps that she, and her potential employer, would not compete and/or solicit any of Scripps' clients, and that her potential employer would put into place protective measures to ensure that it would not compete with Scripps and/or solicit any of Scripps' clients.

41.     Despite these assurances, on January 12, 2022, Scripps, through new counsel, flatly rejected Jenn's request and threatened to sue Jenn's potential employer for tortious interference – all while knowing that it had not interfered with Scripps at all.

42.     Instead of viewing the Non-Compete as protecting its legitimate business interests, Scripps has taken the position that the Non-Compete can be applied to bar Jenn from any employment that is indirectly related to sales, in any way, for any form of media, regardless of

4865-9168-9738

where she is located – which forecloses Jenn from being able to be employed – even if it is not related to her employment.

43.     The Non-Compete is unenforceable for several independent reasons.

44.     The Non-Compete's restrictive covenants are vague and overly broad and states:

As such time as salesperson may leave the Station's employment for any reason, voluntary or involuntary, Salesperson understands and agrees that as a condition for Station entering into the Agreement and Salesperson's employment, Salesperson may not perform services as a Salesperson or in any other sales-related capacity for:

- Any similar business to include, but not limited to: television, radio, newspaper, directory, pure play digital technology company, that will require the Salesperson to conduct business and/or sell digital advertising products within twenty-five (25) miles from the Station's main office
- Any solicited client that was contacted while employed at the Station, or for whom a lead was generated.

45.     Furthermore, the Non-Compete was nullified and superseded by subsequent agreements between Jenn and Scripps. *See* Account Executive Agreement, attached as **Exhibit D**.

46.     Jenn is, in effect, prevented from working.

47.     So that she can pursue new employment without interference from Scripps, Jenn seeks a declaratory ruling that the Non-Compete does not apply to her being employed as a General Sales Manager at a location more than 25 miles from Scripps' main office in Cincinnati, Ohio, and that even if it the terms applied to the new position, the Non-Compete is illegal, void, invalid, and unenforceable under applicable laws and public policy.

48.     In addition, Jenn seeks a determination from this Court that the Non-Compete cannot be used to bar her from taking a sales manager position that does not solicit customers, that would allow her to work remotely, from her home in Clarkston and other locations in Metro-Detroit which are more than 25 miles from Scripp's main office, and/or bar her from taking a position in a different field, radio, than her television sales position at Scripps.

49.     Michigan courts generally disfavor covenants not to compete and view them as restraints on commerce and only enforceable to the extent they are reasonable. A reasonable non-compete agreement protects against the employee's gaining an unfair advantage in competition with the employer but does not prohibit the employee from using general knowledge or skill. *Coates v Bastian Bros, Inc*, 276 Mich App 498 (2007).

50.     Furthermore, MCL 445.774a(l) provides that:

An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

51.     Here, Scripps has no legitimate competitive business interest to protect. Jenn has not made any attempt to solicit Scripps' customers, nor will she; Scripps has not provided Jenn with any specialized training, but hired her for her prior 30 years of sales experience; Jenn will be employed in a management position in a different field than her television advertising sales position; and Jenn would work remotely, from her home, and in Metro-Detroit which is more than 25 miles from Scripps' main office.

52.     Consequently, Scripps has the burden to show that the Non-Compete (1) existed for an honest and just purpose; (2) was established for the protection of Scripps' competitive business interests; (3) was reasonable as to duration, geographical area, and scope of employment; (4) was not injurious to the public; and (5) that any breach of the Non-Compete caused an injury to Scripps. *Coates*, 276 Mich App 498. Based upon the foregoing requirements, Scripps cannot make that showing.

## COUNT I
## Declaratory Relief

53.    Jenn incorporates by reference the preceding paragraphs as if fully restated.

54.    MCR 2.605 provides that the Court may declare the rights and other legal relations of parties in a case of an actual controversy within its jurisdiction.

55.    As set forth above, the Non-Compete does not protect a legitimate business interest under Michigan law, and thus unreasonably restricts Jenn's ability to work.

56.    According, under Michigan law, the Non-Compete is unreasonable, illegal, void, invalid, and may not be enforced against Jenn.

57.    An actual controversy exists between Jenn and Scripps regarding the enforcement of the Non-Compete.

WHEREFORE, Plaintiff Jennifer Van Vallis-Bright respectfully requests that the Court enter a judgment in her favor, declaring that the Non-Compete may not be enforced against her, together with such other and further relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

/s/Benjamin M. Low
Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351-3000
Dated: February 2, 2022                    benlow@jaffelaw.com

9

## **VERIFICATION**

I verify that that the factual statements set forth in the foregoing Verified Complaint are true and correct to the best of my current information, knowledge, and belief.

By: _____

Jennifer Van Vallis-Bright

## <u>INDEX OF EXHIBITS</u>

Exhibit A          Salesperson Non-Compete Agreement

Exhibit B          Proposed Non-Compete

Exhibit C          Termination Letter

Exhibit D          Account Executive Agreement

# EXHIBIT A

## SALESPERSON NON-COMPETE AGREEMENT

This Salesperson Non-Compete Agreement ("Agreement") is made by and between

Jennifer Van Vallis-Bright                    ("Salesperson") and

Scripps Media Inc.                                                                                         ,

("Station"), d/b/a  WMYD                          ("Station.")

WHEREAS, Station operates a local broadcast television station and affiliated website in
Detroit, MI                    ;

WHEREAS, Salesperson has agreed to be employed by Station with responsibilities to sell advertising
inventory on Station's broadcasts and web site to businesses in the DMA;

WHEREAS, to afford Salesperson with the tools and knowledge to successfully sell advertising inventory,
the Station provides the Salesperson with a significant amount of training and proprietary business
information about the Station;

WHEREAS, the Station's ongoing financial success is dependent in large part on maintaining the
confidentiality of its sales approach and proprietary business information; and

WHEREAS, Salesperson has agreed to enter into this Agreement as a condition of employment.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for
other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
Parties, intending to be legally bound, hereby agree as follows:

1. The Station has hired Salesperson to perform any and all sales and marketing duties and
responsibilities assigned by the Station, including but not limited to the selling, developing,
servicing and collection of advertising accounts for all of Station's platforms. Salesperson shall
diligently and faithfully devote Salesperson's entire time, skill and energy to such duties and
responsibilities, which shall be performed under the sole authority, direction, control and
assignment of and by the Station.

2. The Station and Salesperson understand and agree that Salesperson is being employed and
trained by the Company to make sales to Station advertisers, clients and sponsors, which
employment primarily involves contacting, developing, servicing, closely identifying with and
gaining the confidence of such advertisers, clients and sponsors.

3. The Station and Salesperson understand and agree that Salesperson's services to the Station
are unique and extraordinary, in that such advertisers, clients and sponsors of the Station, and
the relationship between the Station and Salesperson and such advertisers, clients and sponsors,
are one of the Station's most valuable and important assets.

4. While employed at the Station, Station and Salesperson understand and agree that Salesperson
will receive specific training and be privy to certain proprietary business information, knowledge or
data concerning the sales procedures, policies, practices or "trade secrets" of the Station,
including but not limited to the Station's financial data, advertiser or client or sponsor accounts or
account lists or rates, or canvassing procedures or policies ("Confidential Information").

5. While employed by the Station, Station and Salesperson understand and agree that Salesperson
will not, without the Station's prior written consent, perform services or work for or at any other
television or radio station, advertiser, newspaper, directory, mobile advertising, SEM, SEO,

audience extension, pure play digital technology company, or cable television system, directly or indirectly, whether with or without compensation.

6. While employed at the Station, Salesperson understands and agrees not to communicate or disclose the Confidential Information to any other person or entity in any manner, directly or indirectly. Salesperson also understands and agrees not to use, or permit others to use, any such Confidential Information, knowledge or data, except in the conduct of the business of the Station.

7. At such time as Salesperson may leave the Station's employment for any reason, voluntarily or involuntarily, Salesperson understands and agrees that Salesperson shall not communicate or disclose Confidential Information to any other person or entity in any manner, directly or indirectly.

8. At such time as salesperson may leave the Station's employment for any reason, voluntary or involuntary, Salesperson understands and agrees that as a condition for Station entering into the Agreement and Salesperson's employment, Salesperson may not perform services as a Salesperson or in any other sales-related capacity for:

   o Any similar business to include, but not limited to: television, radio, newspaper, directory, pure play digital technology company, that will require the Salesperson to conduct business and/or sell digital advertising products within twenty-five (25) miles from the Station's main office

   o Any solicited client that was contacted while employed at the Station, or for whom a lead was generated

   This Agreement shall be in effect for six (6) months from the date of the termination of Salesperson's employment.

9. You agree that upon termination of your employment, and for one (1) year thereafter, you shall not, directly or indirectly, (a) employ or solicit the employment of any person who is then or has been within six (6) months prior to your termination, an employee of the Station or any of its affiliated companies; or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Station or any of its affiliated companies with any user, advertiser, customer, supplier or consultant.

10. In the event of Salesperson's breach or threatened breach of any provisions of this Agreement, including the provisions of Section 8, Salesperson understands and agrees that the Station does not have an adequate remedy at law, and that accordingly, in addition to the Station's right to pursue an action for money damages and other relief, the Station shall be entitled to immediate injunctive relief in court.

11. The Station may assign this Agreement and all rights herein, in whole or in part, to any person or entity, whether or not controlled by the Station or its parent or owner, hereafter acquiring all or part of the Station's television business or holding its broadcasting license.

This Agreement is signed and acknowledged by both the Station and Salesperson, this

24                                     day of  January                        ,

20 20

_Jennifer Van Vallis-Bright_

Jennifer Van Vallis-Bright

Salesperson

_Mike Murri_

Mike Murri

VP/General Manager and/or Station Manager

Document prepared by:
*Greg Bachman*

Greg Bachman

Recruiter

# EXHIBIT B

## Salesperson Non-Compete Agreement Amendment Request

While I thoroughly enjoy working for Scripps Media Detroit and have tremendous respect for the management team, I have an opportunity to pursue a high-profile position at a radio company that aligns better with my personal goal of returning to management. Based on my experience, Scripps Media, Inc does not have a management position in this market available or the future that can offer the same financial and career advancement this opportunity will provide. It would be harmful to my career not to seize this rare management opportunity, especially as a woman in this management consolidation workplace of today.

Furthermore, holding me to my full non-compete would be detrimental to me financially and devasting to my family. As the head of household wage earner, I must work to support my family, or they would suffer greatly.

With that said, I understand that releasing me from certain factors within the non-compete would put the Station at risk. I have no intention to harm the Station or the valued relationships with management in any way. To be allowed to work, and to further reduce the risk of any unfair advantage I would be providing a competitor in the market; I would like to propose that I sign an amended document that:

- Fully commits to not use, or permit others to use, any such Confidential Information, knowledge, or data after the termination of the relationship.
- Twelve (12) months, non-solicited client that was contacted while employed at the Station, or for whom a lead was generated. (6 months more than original.)
- Twelve (12) months agreement after the termination of the relationship to not, directly or indirectly, (a) employ or solicit the employment of any person who is then or has been within six (6) months prior to the termination of employment, an employee of the Station or any of its affiliated companies; or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Station or any of its affiliated companies with any user, advertiser, customer, supplier or consultant.

Thank you in advance for the consideration. Please reach out to me directly with any questions you may have regarding this request.

Sincerely,

Jennifer Van Vallis-Bright

October 7, 2021

# EXHIBIT C



312 WALNUT ST., CINCINNATI, OHIO 45202 | P 513.977.3000  F 513.977.3024

**To:**       Jennifer Van Vallis

**From:**     John Cook

**Date:**     November 30, 2021

**Re:**       Upcoming Scripps Departure

Dear Jennifer,

This letter is to officially notify you of your upcoming separation from employment effective December 3, 2021 (separation date), due to noncompliance with the Scripps COVID-19 vaccination policy.

We appreciate your contributions to Scripps and wish you well in your future endeavors. Should you decide to re-apply for employment at Scripps in the future, please note that your separation due to the vaccination policy at this time does not disqualify you from rehire.

A few reminders as you prepare to leave Scripps:

- Your final paycheck, including any accrued, unused PTO, will be paid on the next regularly scheduled pay date following your separation date, or earlier where required by state law. Questions about your final pay can be directed to the Scripps Employee Service Center at 866-397-1214.

- You are eligible for a prorated bonus under the terms of your account executive compensation plan.  Any bonus, if earned, will be paid out when the applicable bonus is paid out to current Scripps account executives as outlined in the plan].

- Attached is important information about Scripps benefits upon your departure.

- Please collect all personal belongings and return all company-provided property by your separation date, such as any Scripps computer, phone, corporate credit card, badge, keys, and any Scripps confidential or proprietary information.

- Certain obligations to Scripps extend beyond your separation date, such as your responsibility to safeguard all Scripps confidential and proprietary information, as well as any non-competition or non-solicitation obligations.

- Please keep your address current with the company so that applicable information, such as W-2 forms and 401(k) statements, can be accessed online in Workday and are mailed to the correct address in a timely manner. You can send an email to HROperations@scripps.com and provide your home email address. Scripps will then send you an email with instructions on how to reset your Workday password so you

can access information online . As a former employee, you can also update your address by calling the Scripps Employee Service Center at 866-397-1214.

- Please let me know if you have any questions about your upcoming departure. Thank you again for your service to Scripps.

*cc: Personnel file*

2

## Key Benefits Information for Departing Scripps Employees

Below is information about Scripps benefits (if applicable) upon separation:

**Medical, Dental, Vision, Life Management Program and Limited Purpose Health Care Spending Account:** If you are a participant in the Scripps Choice Plan, your active employee health care coverage will continue through the month in which your separation date occurs and will expire at midnight on the last day of that month.

If you are enrolled in the company's medical, dental, vision, life management program and/or limited purpose health care spending account plan(s) as of your last day of employment, you will receive a COBRA notice containing the necessary information and forms by mail from Scripps' third-party COBRA provider, HealthEquity (formerly WageWorks).  The notice will explain your rights and the procedures for continuing medical, dental, vision, life management program and limited purpose health care spending account plan coverage, if applicable.  Once you receive your COBRA notice, you will be able to elect and enroll in COBRA continuation coverage by mail or on-line at mybenefits.wageworks.com. You must enroll within the required time frames.  To maintain your coverage, you must timely pay the required cost of COBRA continuation coverage (i.e., monthly premiums).  If you have questions in the meantime regarding continuation of benefits, you can contact HealthEquity COBRA Services at 888-678-4881.

If you are enrolled in a Scripps medical plan with a Health Savings Account (HSA), and the HSA has a balance upon your last day of employment, your HSA will continue through HealthEquity.  However, you will be responsible for the associated HSA account fees. These fees will be deducted from your HSA balance on a monthly basis. If you wish to close your HSA account, or you have questions regarding the fees, you may call the number on the back of your HSA debit card. If you withdraw funds from your HSA account, it is advised that you maintain records and documentation to show proof that the funds were used to pay for eligible health care expenses. Consult a financial consultant if you have questions regarding HSA withdrawals. HealthEquity's number is 877-299-3672.

**Scripps Managed Disability Plan:** Eligibility under the Scripps Managed Disability Plan (short-term and long-term disability), if applicable, ends on your last day of employment.

**Life Insurance and Accidental Death and Dismemberment (AD&D**): When your employment ends, you have the option to convert your Scripps Choice Plan Group Term Life Insurance coverage, Dependent Life Insurance coverage and Accidental Death and Dismemberment coverage, if applicable, to individual policies within 31 days of your termination date. If you wish to convert to an individual coverage policy, contact the Benefits Help Center at 855-376-7996 as soon as possible to initiate the process.

**Flexible Spending Accounts:** *Limited Purpose Health Care Spending Account*
All requests for reimbursement, if applicable, of expenses incurred up to the last day of the month in which your employment terminates must be submitted by March 31, next year. You may extend your coverage period by continuing to make contributions

for the balance of the year on an after-tax basis and as a result of exercising your COBRA rights by electing to continue your Limited Purpose Health Care Spending Account. ***Dependent Care Spending Account*** — All requests for reimbursement for expenses incurred up to the last day of the year in which your employment terminates must be submitted by March 31, next year. HealthEquity's number is 877-299-3672.

**Scripps Employee Stock Purchase Plan (ESPP):** You will be entitled to your account balance under the Scripps Employee Stock Purchase Plan, subject to the plan's terms and conditions. You will not be permitted to maintain you current ComputerShare account, however, and must elect to transfer your shares to your personal broker to sell your shares shortly after your last day of employment.

You may contact ComputerShare at www.computershare.com/employee/us or at 800-326-4548, where representatives are available Monday through Friday, 8 a.m. to 7 p.m. Eastern.

**Scripps Retirement and Investment Plan (SRIP):** If you participate in the SRIP you are entitled to your account balance, subject to the plan's normal withdrawal and distribution rules.

If you have a loan outstanding under the SRIP, the loan will become due on your separation date. The deadline for repaying the loan is the end of the calendar quarter following the quarter in which your employment ended. If you choose not to repay the loan, the outstanding balance becomes a taxable distribution, and you are responsible for any applicable taxes and penalties. Consult a financial consultant if you have further questions regarding your 401(k) plan.

You may contact Vanguard directly at 800-523-1188 to discuss your options.

**Scripps Pension Plan:** If you are vested in the Scripps Pension Plan, you will have those vested rights under the terms of the plan and subject to the plan's normal distribution rules. You will receive information from the company regarding any such benefits. Please call Donald Fogg, Corporate Human Resources, at 513)-977-3098, with any questions.

**Restricted Stock Awards:** All awards that are unvested as of your separation date are forfeited. Merrill Lynch handles the administration of stock-based awards. For more information, contact Merrill Lynch directly at 877-767-2404 or through their website, www.benefits.ml.com.

If you are retirement eligible, all of your time-based restricted share units will vest upon your retirement date and your performance-based restricted share units will remain outstanding until the performance metric is announced (typically February of the following year).

4



**PROOF of EMPLOYMENT (ONLY):**

Provide the following to the verifier:
- Your Employee ID
- Employer Code: 28398

The verifier can then use either of the following options to verify your employment:
- The WorkNumber website: http://www.theworknumber.com/
- Call the WorkNumber at: (800) 367-2884

---

**PROOF of EMPLOYMENT PLUS <u>INCOME VERIFICATION</u>:**

**Step 1.**
- Go to the WorkNumber website at: http://www.theworknumber.com/
- Select the Employee option and login using the following:
- Your Employee ID Number
- Employer Code:
  - For verification of income for 2018 and prior use employer code: 13313
  - For verification of income for 2019 and going forward, use the employer code: 28398
- Your PIN Number

**NOTE:** Your Default PIN is your 4-digit year of birth + last 4 digits of your SSN. The Default PIN is only good for 90 days. After that, you will be forced to establish a new PIN when you log in. PIN numbers must be at least 4 characters long.

**Step 2.**
Once you have logged in, you will set up a 6-digit Salary Key number.

**Step 3.**
Provide the following to the verifier:
- Select the Employee option and login or (800) 367-2884
- Your Employee ID number
- Employer Code:
  - For verification of income for 2018 and prior use employer code: 13313
  - For verification of income for 2019 and going forward, use the employer code: 28398
- The 6-digit Salary Key number you established in Step 2.

# EXHIBIT D

# SCRIPPS

# Account Executive

| | |
|---|---|
| **Plan Participants** | Detroit (WMYD) AE Plan document |
| **Plan Effective Dates** | The Plan Document is effective from January 1, 2019 through December 31, 2019. |
| **Plan Components** | Guaranteed pay<br>Monthly commissions<br>Quarterly performance bonus |
| **Guaranteed Pay** | Guaranteed pay is paid bi-weekly (twenty-six pays per year) |
| **Monthly Commissions** | Monthly commissions are paid based on the revenue type and standard rate stated in the commission schedule presented below. |

Monthly commissions are paid on the second check of the month following the month in which they are earned and are paid when monthly commissions exceed the monthly guaranteed pay (prorated, where applicable). Each check will include guaranteed pay; the second check of the month will consist of any commission payments due over and above the monthly guaranteed pay.

Television advertising commission is paid on net revenue. Digital commission is paid on net revenue before contra expense and after adjustments.

### Monthly Commission Schedule

| Revenue Type | Retained | New Business | Station Initiatives |
|---|---|---|---|
| Broadcast - Direct | 12.0% | 13.0% | 0.5% |
| Broadcast - Discount | 6.0% | 6.0% | 0.5% |
| Digital - on-site | 15.0% | 20.0% | 0.5% |
| Digital - off-site/3rd party | 10.0% | 15.0% | 0.5% |
| Digital - SEM | 5.0% | 5.0% | 0.5% |

### Individual/Jumbo Digital Accounts

For individual/jumbo digital accounts, Participant will be paid the commission rate indicated in the commission schedule up to $2 million in revenue. The Participant is then eligible to earn an additional 1% for every dollar above $2 million in revenue.

# SCRIPPS

# Account Executive

## Revenue Types

<u>Broadcast - Direct</u>: Accounts that do not have a discount or an agency commission.

<u>Broadcast - Discounted</u>: Accounts that do have a discount or agency commission.

<u>Digital - on-site</u>: Any ad associated with Scripps owned and operated brands (e.g. tvstation.com, tvstation social media)

<u>Digital - off-site/3rd party:</u> Any ad not associated with Scripps owned and operated brands with the exception of SEM (e.g. Scripps targeted network display and/or video including OTT, Google display network)

<u>Digital - SEM</u>: Any pay-per-click ad through Google or another SEM provider.

<u>Retained:</u> Any accounts, broadcast or digital, retained by the station for more then 12 months.

<u>New Business</u>: Any accounts, broadcast or digital, that have not been on the station in the past 12 months and were developed through the direct efforts of the Account Executive and a sales track can be demonstrated through customer needs analysis and presentations. This does not include new broadcast or digital sold on an existing account. Approval through the Transaction Management System (TMS) is required.

<u>Station Initiatives</u>: A sponsorship or corporate initiative that is part of a station's special opportunity budget and approved through the Transaction Management System (TMS). Accounts sold into Station Initiatives will be considered as revenue by appropriate definition and paid a kicker (e.g.+0.25%) as indicated in the monthly commission schedule.

<u>Individual/jumbo digital account</u>: Any digital account with a gross revenue value greater than $2 million annually. Individual/jumbo digital accounts will be paid as indicated in the commission schedule and do not count toward the new business goal. Approval through the Transaction Management System (TMS) is required.

**Quarterly Performance Bonus**

A Participant may be eligible for a quarterly performance bonus based on achievement of the new business goals.

The following revenue types count toward achievement of the new business goal, once approved:

- Broadcast - Direct
- Broadcast - Discounted
- Broadcast Station Initiatives (Direct, Discounted, Retained, and New)

If goal achievement for the quarter is greater than 90%, a performance bonus will be paid on the following revenue types:

- Broadcast - Direct
- Broadcast Station Initiatives (Direct)



# Account Executive

| Quarterly Goal Achievement | Bonus |
|---|---|
| 90% to < 100% | 1.5% |
| 100% to < 105% | 5.0% |
| 105% to 110% | 7.0% |
| >110% | 10.0% |

Performance measurements are rounded to the nearest whole number. For example, an 89.5% revenue performance to goal is rounded to 90% for the purposes of calculating the quarterly bonus.

The quarterly performance bonus is calculated at the end of a quarter and paid on the second check of the month following quarter-end.

**Other Plan Definitions**

Chargeback: A commission amount recouped from the employee due to an adjustment or an account that was written-off as uncollectible.

Company: The E. W. Scripps Company and all its subsidiaries.

Contra: Contra revenue is a deduction from revenue that represents the amount the Company owes to a third party for services rendered.

Digital products: This list represents the most common types of digital products sold. Any digital product not outlined below may be subject to prior review.

| On-site | Off-site/3rd party | SEM |
|---|---|---|
| Tvstation.com | Audience extension: | Google |
| Desktop | STN | Bing |
| Mobile | GDN | Facebook ads |
| tablet | SEO | |
| Pre-roll | Website | |
| HIU | Website housing | |
| News app | Reputation influence | |
| Station social post | Email marketing | |
| Station email sponsorships | | |
| Contest | | |
| Native | | |

# SCRIPPS

# Account Executive

**Terms and Conditions
Specific to this Plan**

Net revenue: Revenue net of adjustments, including write-offs.

Commissions from billings that are written-off during the commission period will be deducted from the next commission pay.

Goals are assigned annually by the Director of Sales.

The Company may choose to offer other low-margin digital products ("contra" products) and will communicated applicable commission to be paid on these products prior to product introduction. Contra revenue is counted at the gross amount towards the achievement of the digital goal.

As legally allowed, any amounts due to the Company will be deducted from future payments made.

This sales compensation plan is subject to the Local Media Sales Plan Terms and Conditions (Ts & Cs) effective for 2019.

 **2019 Local Media Terms and Conditions**

**Participation and Eligibility**

In order to participate in the attached Sales Compensation Plan (hereafter referred to as "the Plan"), an individual (hereafter referred to as "Participant") must be an employee of The E.W. Scripps Company (hereafter referred to as "the Company"). Furthermore, the Participant must be in a commission or bonus eligible position and have signed the attached Acknowledgment of Understanding. No commission or bonus payments will be earned under the Plan until the Participant signs the required agreements.

**Plan Changes or Discontinuance**

In its sole discretion, the Company may add to, amend, modify, or discontinue any of the terms or conditions of the Plan at any time during the Plan period, provided that the action does not reduce the amount of award earned before the date of the action.

**Earned Commissions and Bonuses**

A commission is defined as compensation earned by the Participant as a percentage of revenue from Scripps products sold which are based proportionately on the amount or value thereof (as defined in the Plan). A bonus is defined as compensation earned by the Participant for services rendered in the management and/or support of Scripps products and services for meeting or exceeding goals, completing tasks, etc.  A commission or bonus is defined as earned when the Company recognizes the associated revenue. Revenue is recognized when the Company satisfies a performance obligation, i.e. an advertisement runs for the customer.

Commissions and bonuses are paid based on the assumption that the client or advertiser will pay and that there are no discrepancies that would prohibit the company from recognizing associated revenue. Discrepancies may include breaking news segment replaces ad, weather announcements or internal technological difficulties. Commission and bonus chargebacks will be applied against future commissions or bonuses after the Company has written off an account. If adjustments are made that affect commsion and bonus goals achieved, the Company reserves the right to adjust the commissions or bonuses in order to reflect actual revenue earned. These adjustments may be taken from future payments to the Participant unless otherwise stated by law.

**Payment of Base Compensation and Earned Commissions and Bonuses**

*Base Compensation*

Compensation paid bi-weekly, twenty-six pays per year.

*Monthly Commissions*

Participants earning monthly commissions will receive payment on the second pay of the month following the month in which the commission was earned. Commissions paid will be offset by base compensation (i.e. guaranteed pay), where applicable.

*Monthly Bonuses*

If a Participant is eligible for a monthly bonus, earned bonuses will be paid on the second pay of the month following the month in which the bonus was earned.

**SCRIPPS**   **2019 Local Media Terms and Conditions**

*Quarterly Bonuses*

If a Participant is eligible for a quarterly bonus, earned bonuses will be paid on the second pay of the month following the quarter in which the bonus was earned.

*Annual Bonuses*

If a Participant is eligible for an annual bonus, earned bonuses will be paid on the second pay of the second month following the year in which the bonus was earned.

## Proration

Prorated base compensation, commission and bonus calculations for New Hires, Transfers, Terminations and Resignations, Leaves of Absence, etc. are based on the number of days active per the Plan period. Spot sales for an Account Executive plan will be credited for actual spots run during the time the Participant was active for the Plan period.

## Sales Adjustments and Chargebacks

Sales adjustments and chargebacks will be recovered at the same rate that commissions are paid. All account adjustments are eligible for the chargeback. In addition, all accounts that are written off will also be charged back at the time of write-off. Any adjustments or chargebacks will be included in the Participant's pay statement in the sales compensation tool.

Sales adjustments and chargebacks will be recovered against commissions or bonuses earned in the period in which the adjustment or chargeback occurs. Any exceptions to this policy will be granted at management's discretion.

## Employment Status

*New Hires, Transfers and Promotions*

Commissions and bonuses for new hires, transfers, or changes to base compensation will be prorated to the start date of the eligible position. When a Participant transfers from an eligible sales position to a non-sales position, commissions and bonuses are earned through the last day in the commission/bonus eligible position.

If an annual sales bonus is applicable per the Plan, the Participant must be hired as a Scripps employee on or before September 30 of the plan year in order to be eligible.

*Leaves of Absence*

Unless otherwise stated by law, the Participant is eligible to be paid earned commissions and/or bonuses, as defined in "Earned Commissions and Bonuses," while on paid leave (e.g., PTO, parental leave, Company holiday), military leave, and certain unpaid company-approved absences.

A Participant on leave will receive payment for earned commissions and bonuses through the last day prior to the effective date of leave. A Participant's goals will not be adjusted as a result of entering or returning from a leave of absence.

# SCRIPPS 2019 Local Media Terms and Conditions

Any sales adjustments or chargebacks that occur in the month the Participant is entering a leave of absence or returning from a leave of absence will be subtracted from the Participant's prorated commissions only. Sales adjustments and chargebacks will not be deducted from a Participant's leave pay.

When a Participant returns from a leave of absence to active service, he/she will be eligible to earn commissions or bonuses from the date of return. Eligibility for earned incentive in a team environment is defined as significant participation in completing goal attainment as defined by the supervising manager.

During a Participant's leave of absence, his/her accounts may temporarily be reassigned. One of following three options may be used for the temporary assignment:

1) Move accounts to another Account Executive (AE) to cover.  (Note: The covering AE should be added to the order in WideOrbit as a secondary AE at 0% and an adjustment should be entered in the Sales Compensation system for the covering AE so that commissions can be calculated correctly. In this scenario, the covering AE is paid the same rates as the original AE.
2) Hire a temporary contractor to cover the accounts, in which case a flat fee will be paid to the contractor.
3) Place the accounts on the "House" account, in which case no commissions are paid.

Short-term disability (STD). If a Participant is placed on short-term disability or leave of absence according to the Company's guidelines (i.e., if pay-eligible and paid at a percent based on years of service), his/her prior on-target commissions and quarterly bonuses for the Plan period shall be calculated and annualized using his/her average of base compensation, commissions, and quarterly bonuses for the past 12 months. Any annual bonuses as defined in the Plan will only be prorated if the Participant is on an unpaid leave of absence.

Long-term disability (LTD). If any Participant is placed on long-term disability, no continuing commissions or bonuses will be due. Long-term disability claims are paid through a third-party administrator using the annualized base compensation, commissions, and quarterly bonuses for the 12 months of service prior to initiating leave. A Participant placed on long-term disability in the calendar year is eligible for a prorated annual bonus, as defined in the Plan, if the Participant returns to active status on the last day of the plan-year.

Family & Medical Leave Act (FMLA). A Participant on Family and Medical Leave Act leave will be paid only those incentives earned prior to initiating the leave. If the Participant is on short-term disability while on FMLA, Participant will be paid in accordance to the short-term disability policy. If Participant is on an unpaid leave while on FMLA, no commissions or bonuses will be paid during that time.

*Terminations and Resignations*

Any commissions earned will be paid to the Participant according to the Plan upon termination or resignation. If applicable, any commissions owed will be prorated to the last day of employment. The Participant must be employed on the last day of the period (e.g., quarterly, annually) to be eligible for any true-up or bonus payout.

Any accrued, but unused, paid time off (PTO) will be paid out based on regular (base compensation) earnings.

# SCRIPPS   2019 Local Media Terms and Conditions

*Retirement*

In the event of retirement, commissions and bonuses will be prorated for retirement eligible employees as of the final date of active employment. An employee is considered retirement eligible if the employee is at least age 65 and one year of service, or is at least 55 years old with 10 years of service (early retirement).

*Death*

In the event of death, the Company will pay commissions for monthly payouts as if the Participant had lived to the end of the month and achieved 100% of goal. For quarterly and annual true-up or bonus payouts, the Company will pay prorated commissions as if the Participant had lived to the end of the quarter and will be based upon the Company's attainment of the Performance Goal, where applicable.

## Commission Splits for Cross-Station Sales

In cases where a deal spans multiple markets, the total commission payout will be split in WideOrbit between the selling AE and the covering AE at the advertising station. The exact allocation of the payout will be determined by the Plan Administrator but will not exceed 100% of the calculated commission payout.

## Rights and Limitations

The Plan document is the only governing agreement between the Company and the Participant. This Plan supersedes any previous agreement or understanding regarding compensation. Any undocumented agreement of any kind concerning compensation will not be considered valid and will not be honored. Any sales transactions or business conducted outside of established guidelines, or deviations from such guidelines without documented approval from sales management, may result in the withholding or recovery of compensation on this transaction/business. Nothing in this Plan may be construed to mean that it gives any person any right to be paid any amount other than under the terms of this Plan.

All customer accounts, direct, digital or discounted, are Scripps customer accounts and are assigned to Account Executives to manage as determined by local sales leadership. Customer accounts are not the property of any individual AE and may be reassigned at any time based on sales management's discretion.

## Training Costs Agreement

For newly hired Sales Account Executives, the Company may provide an AE Onboarding Scripps Sales Process training and development course (the "Training") at a time and location of its choosing. The Training cost for the program is $3,000 per person and covers transportation, lodging, classroom sessions, books or other materials, and any other associated expenses (the "Cost").

If you complete the full program and voluntarily resign your employment for any reason, you shall repay the Company as follows:

- If you cease employment before you attend the Training but the Company has already incurred liability for the Cost, 75% of the Cost shall be repaid;
- If you cease employment during the Training or within 12 months of completing the Training, 100% of the Cost shall be repaid;

# SCRIPPS 2019 Local Media Terms and Conditions

- If you cease employment more than 12 months but no more than 24 months after completion of the Training, 50% of the Cost shall be repaid.

To the extent permitted by law, you agree that the Company may deduct a sum equal to the whole or part of the Cost due from you or from any other allowances, expenses, or payments due to you.

The amount due to the Company under this provision is a genuine attempt by the Company to assess loss as a result of the termination of the Participant's employment. This provision is not intended to act as a penalty on the Participant upon termination of his/her employment.

## Non-Solicitation

The Participant agrees that upon termination of employment, and for one (1) year thereafter, he/she shall not, directly or indirectly, (a) solicit the employment of any person who is employed or has been employed by the Company or any of its parent, subsidiary, or affiliated companies within six (6) months prior to the Participant's termination; or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Company or any of its parent, subsidiary, or affiliated companies with any user, advertiser, customer, supplier or consultant. This does not pertain to lawful solicitation of customers through marketing, advertising and other similar efforts.

## Governing Law

This agreement shall constitute the entire understanding between the Company and Participant, shall supersede any and all prior understandings between the Company and Participant and shall be construed according to the laws of the State of Ohio.

## Disputes

Any disputes regarding the terms of the Plan, its application, or administration should be addressed first with Participant's immediate supervisor. If the resolution is not satisfactory, the dispute should be addressed with the Director of Sales. If a satisfactory resolution cannot be reached, the dispute should be escalated to the Local Media sales leadership. This is the final step in the process.

# SCRIPPS 2019 Local Media Terms and Conditions
# Acknowledgment of Understanding

I acknowledge that I have received a copy of the Sales Compensation Plan for Local Media (Television). By signing this Acknowledgment, I agree to the terms and conditions as stated in the Plan and its corresponding policies and procedures, and I understand that this Plan, as modified from time to time by the Company, supersedes any and all previous plans, policies, and oral or written understandings regarding commissions, bonuses, and pay structures.

I acknowledge that the Company reserves the right to amend, modify, or terminate any or all provisions within this Plan, at any time, with or without notice, at its sole discretion. Local Media sales leadership, in concert with Corporate Human Resources and Finance, shall have sole discretion to interpret and administer plan provisions.

| Plan Participant (Printed Name) | Signature | Date |
|---|---|---|

| Brian Lawlor | | 12/31/2018 |
|---|---|---|
| Scripps Representative (Printed Name) | Signature | Date |

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**JENNIFER VAN VALLIS-BRIGHT**
an individual,

       Plaintiff,                                Case No. 22-192350-CB

v                                           Hon. Michael Warren

**SCRIPPS MEDIA INC.**, a foreign company,

       Defendant.

---

Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
benlow@jaffelaw.com

---

## <u>NOTICE OF HEARING</u>

       PLEASE TAKE NOTICE that the Plaintiff's Motion for Preliminary Injunction will be brought on for hearing before the Hon. Michael Warren, Oakland County Circuit Court, on Wednesday, February 16, 2022 at 8:30 a.m. or as soon thereafter as counsel may be heard.

                                     Respectfully Submitted,

                                      /s/ Benjamin Low
                                      Benjamin M. Low (P82834)
                                      JAFFE, RAITT, HEUER & WEISS, P.C.
                                      *Attorneys for Plaintiff*
                                      27777 Franklin Road, Suite 2500
                                      Southfield, MI 48034
Dated: February 2, 2022                    (248) 351-3000
                                      benlow@jaffelaw.com

FILED    Received for Filing    Oakland County Clerk    2/2/2022 3:32 PM

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**JENNIFER VAN VALLIS-BRIGHT**
an individual,

       Plaintiff,                                              Case No. 2022-192350-CB

V                                                                   Hon. Michael Warren

**SCRIPPS MEDIA INC.**, a foreign company,

       Defendant.

---

Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351-3000
benlow@jaffelaw.com

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

FEE

      Plaintiff Jennifer Van Vallis-Bright ("Jenn") through her attorneys, Jaffe, Raitt, Heuer & Weiss, P.C., requests that this Court issue a Preliminary Injunction pursuant MCR 3.310: temporarily restraining and enjoining Defendant Scripps Media Inc. ("Scripps") and anyone acting in concert with it from enforcing a January 24, 2020 non-competition agreement (the "Non-Compete") against Jenn in her employment as a General Sales Manager in Metro-Detroit and granting such other and further relief as the Court deems just and proper under the circumstances.

      Counsel for Scripps and Jenn have agreed to stipulate to an order providing for a hearing on Jenn's Motion for Preliminary Injunction 14 days after the filing of this Motion, with Scripps' response brief due 3 days before said hearing.

1

As fully explained in the accompanying brief, the Motion should be granted because the Non-Compete is not enforceable against Jenn in her position as a General Sales Manager in Metro-Detroit and Jenn is suffering irreparable injury. For these reasons, Jenn requests that the Court enter a Preliminary Injunction, attached as **Exhibit A** to her Brief in Support.

Respectfully submitted,

/s/Benjamin M. Low
Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
Dated: February 2, 2021                    benlow@jaffelaw.com

2

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**JENNIFER VAN VALLIS-BRIGHT**
an individual,

      Plaintiff,                                Case No. 2022-192350-CB

V                                           Hon. Michael Warren

**SCRIPPS MEDIA INC.**, a foreign company,

      Defendant.

---

Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351-3000
benlow@jaffelaw.com

---

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

    Plaintiff Jennifer Van Vallis-Bright ("Jenn") initiated this lawsuit seeking a declaratory judgment that Defendant Scripps Media Inc. ("Scripps") cannot enforce an overly broad and invalid non-competition agreement (the "Non-Compete") against which is preventing her from working and providing for her family. Jenn was previously employed by Scripps as an Account Executive and was responsible for direct sales of television advertising to customers that Scripps gave to Jenn. On December 3, 2021, Jenn was terminated from Scripps for not being vaccinated, pursuant to Scripps' Covid-19 vaccination policy. Despite assurances from Scripps that she could obtain a release from her Non-Compete, Scripps has now refused to release her from the Non-

Compete and to allow her to work as a General Sales Manager for a company in broadcast radio. Because Jenn needs a release from Scripps in order for her potential employer to employ her, Jenn seeks a ruling that Scripps cannot enforce the Non-Compete against her, as the Non-Compete is invalid for numerous independent reasons, including:

The Non-Compete that Scripps relies upon to prohibit Jenn from being employed was superseded and nullified by Jenn's subsequent agreements with Scripps. After Jenn began her employment with Scripps, and on an annual basis, Jenn entered into Account Executive agreements with Scripps which nullified all of Jenn's previous agreements with Scripps. Because the Account Executive agreements nullified the Non-Compete, Scripps cannot now enforce it against her, and it should be ordered not to enforce it against her in her potential employment as a General Sales Manager.

The Non-Compete, on its face, cannot apply to Jenn's potential employment as a General Sales Manager. The Non-Compete only applies to a 25-mile radius from Scripps' main office – which is in Cincinnati, Ohio – and only applies to work as a sales agent or in a sales capacity. Jenn's potential employment is well outside of that 25-mile radius and is in a management, not sales, role. Despite that, Scripps has still threatened to sue Jenn and her potential employer if she begins any employment.

Additionally, the Non-Compete does not meet the strict requirements for enforcement. It is overly broad in its terms and unenforceable, as it seeks to prohibit Jenn from employment in any form of media – not just the form that she was employed by Scripps for, television – despite the significant differences between television advertising and radio advertising.

Because Jenn will be, and is being, irreparably harmed by not being able to be employed, and because she will succeed on her claims that the Non-Compete is invalid, a preliminary

injunction should be entered that prohibits Scripps from attempting to enforce the Non-Compete in Jenn's potential role as a General Sales Manager, for a radio company, in Metro-Detroit.

## FACTS[1]

Jenn is the primary breadwinner for her family who rely upon her in order to pay for their expenses, which includes their home mortgage. *See* Verified Complaint at ¶ 5. Jenn had 30 years of sales experience prior to starting with Scripps. *Id*. at ¶ 48. Prior to January 24, 2020, Jenn was negotiating with Scripps for her employment as an Account Executive for Jenn to have a role selling television advertisements for Scripps. *Id*. at ¶ 7.

On January 24, 2020, Jenn was contacted by Tony Lamerato ("Tony"), Scripps' Director of Sales, to discuss signing a non-competition agreement with Scripps (the "Non-Compete") in connection with her offer to be employed by Scripps. *See* Salesperson Non-Compete Agreement, attached as **Exhibit B**. Jenn, at the time Tony contacted her, she was not at home, but was at the hospital due to her father's illness, and she took Tony's call outside the elevators at the hospital. *Id*. at ¶ 9. In their conversation, Tony was adamant that Jenn had to sign the Non-Compete immediately if she wanted to start employment with Scripps the following month. *Id*. at ¶ 10. When Jenn hesitated in responding to Tony, Tony directly informed her that Scripps would not stand in the way of her next career move and implied that Scripps regularly released its employees from the Non-Compete. *Id*. at ¶ 12. Jenn, relying upon Tony's express representations, signed the Non-Compete, believing that Scripps would not stand in the way of her future career choices. *Id*. at ¶ 14.

Jenn was employed by Scripps from February 2020 through December 2021. *Id*. at ¶ 15. During her employment, Jenn was an exemplary employee for Scripps, and won the Account

---

[1] In addition to these facts, Jenn relies upon the facts in her Verified Complaint.

5

Executive of the Year Award for 2020 and would have won it in 2021 if she was not terminated, due to the high volume of sales that Jenn generated for Scripps. *Id*. at ¶ 17. Despite that, Scripps terminated Jenn for non-compliance with its Covid-19 vaccination policy on December 3, 2021. *Id*. at ¶¶ 19-31.

Prior to her termination, Jenn continued to close on large sales for Scripps, all while knowing that she would be fired in December. *Id*. at ¶ 33. When her termination date was looming, Jenn contacted Tony and requested his assistance in obtaining a release from the Non-Compete, so that she could continue to support her family. *Id*. at ¶ 26. Tony suggested that Jenn send a formal request to Scripps' HR and Director of Sales, John Cook, to ask for a release. *Id*. at ¶ 27. Jenn did so but was not able to secure a release of the Non-Compete from Scripps, even though she provided them with an alternative, more restrictive, non-competition agreement. *Id*. at ¶ 30. Upon Jenn's discharge, she was informed by Scripps' HR Director, Tamika Heslip, that if she was a finalist for another position, she could email a request to be released from the Non-Compete. Jenn was further informed that she could file and receive unemployment. Both of those statements proved to be false.

Subsequent to her termination, Jenn was offered a position as a General Sales Manager for a company that was in radio broadcasting. *See* Affidavit of Jennifer Van-Vallis Bright, attached as **Exhibit C** at ¶¶ 11-12. The General Sales Manager position was a management role for the potential employer, where Jenn's primary responsibilities would be to coach and lead a sales team through providing support, leadership, and training to that team. *Id*. at ¶ 12. However, in order to be able to begin employment with that company, Jenn needed to get a release of the Non-Compete from Scripps. *Id*. at ¶ 27.

4873-5207-1180

Because Jenn's potential position as a General Sales Manager in radio was significantly different than her position as an Account Manager for direct television advertising sales, and because Scripps stated that she would not have any problem being released from the Non-Compete, Jenn requested a release, once again, from the Non-Compete. *Id*. at ¶¶ 26-27. Jenn did not receive a release, and, on December 13, 2021, she contacted Scripps through counsel, requesting a release from the Non-Compete. Pl's Compl at ¶ 36. Scripps failed to respond until December 22, 2021, where it asked for more information about the potential General Sales Manager position. *Id*. at ¶ 37. Jenn, through counsel, provided the requested information with a renewed request for a release from the Non-Compete. *Id*. at ¶ 38. Scripps, then, asked for more information on January 3, 2022, which was provided the next day. *Id*. at ¶ 39. However, on January 12, 2022, Scripps responded with a flat out rejection of Jenn's request and threatened to sue Jenn's potential employer for tortious interference – all while knowing that Jenn had done everything possible to work with Scripps. *Id*. at 40.

Now, Jenn is unable to work and is unable to support her family. **Exhibit C** at ¶¶ 28-31. Jenn is running out of savings, and will not be able to pay for her, and her family's, essentials very soon – including their mortgage, which will result in Jenn losing her home. *Id*. at ¶¶ 33, 35-37. Because Jenn is being irreparably harmed, Jenn seeks an order from this Court that will prohibit Scripps from enforcing the invalid Non-Compete against her, so that she can be gainfully employed and so that she can support her family.

## ARGUMENT

### I.    Jenn Is Entitled To A Preliminary Injunction

A court should examine four factors to determine whether to grant a preliminary injunction.

*Campau v McMath,* 185 Mich App 724, 729 (1990). These four factors are:

1.    The irreparable harm to the plaintiff if the requested injunction is not granted;
2.    The likelihood of success on the merits;
3.    The harm to the public interest; and
4.    The risk that the party seeking the injunction will be harmed more by the denial of the injunction than the opposing party would be by granting the injunction.

*Id.* In moving for a preliminary injunction, Jenn merely seeks to be able to work and to be able to provide for her family – something which is in extreme jeopardy as Jenn is currently unable to work due to Scripps' threats about the Non-Compete and Scripps' opposition to Jenn's receipt of unemployment. The Michigan Supreme Court has specifically recognized the appropriateness of injunctive relief and held that:

> It is not necessary that the complainant's right be clearly established, or that the court find complainant is entitled to prevail in the final hearing. It is sufficient if it appears that there is a real or substantial question between the parties, proper to be investigated in a court of equity, and in order to prevent irremediable injury to the complainant, before his claims can be investigated, it is necessary to prohibit any change in the conditions and relations of the property and of the parties during the litigation.

*Niedzialek v Journeymen Barbers, Hairdressers and Cosmetologists' In'l Union of Am, Local 552, AFL,* 331 Mich 296, 300-01 (1951). *See also, e.g., Campau v McMath, supra* at 728-29; *Plaza Sec Co v Fruehauf Corp*, 643 F Supp 1535, 1541 (1986); *Michigan State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 157-58 (1984); *Consumers Power Co v Michigan Public Serv Comm*, 415 Mich 134, 155 (1982); MCR 3.310(A)(1) and (B).

Michigan courts have consistently held that an injunction should be issued where a lawsuit alone would not provide the injured party with adequate relief. *See, e.g., Wagner Electric Corp v*

*Hydraulic Brake Co*, 269 Mich. 560, 565 (1935); *Consumers Power Co, supra* at 155. Such is the case here, where Jenn is in very real danger of defaulting on her mortgage and leaving her family without a home if Scripps is allowed to continue to hold the threat of the enforcement of an invalid Non-Compete to stop Jenn from being able to work.

### A.  Jenn Is Likely to Succeed on the Merits of Her Declaratory Judgment Claim

In her claim for a Declaratory Judgment, Jenn seeks a ruling from this Court that the Non-Compete is not enforceable against her in her potential position as a General Sales Manager for a company in a separate line of work at a location which is more than 25 miles from Scripps' main office. Michigan courts generally disfavor covenants not to compete and view them as restraints on commerce that are only enforceable to the extent that they are reasonable. A reasonable non-compete protects against the employee gaining an unfair advantage in competition with the employer but does not prohibit the employee from using general knowledge or skill. *Coates v Bastian Bros, Inc*, 276 Mich App 498. MCL 445.774a(1) provides that:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment in a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Consequently, Scripps has the burden to show that the Non-Compete (1) existed for an honest and just purpose; (2) was established for the protection of its competitive business interests; (3) was reasonable as to duration, geographical area, and scope of employment; and (4) was not injurious to the public; and (5) that any breach caused injury to Scripps. *St Clair Med, PC v Borgiel*, 270

Mich App 260, 266 (2006).[2] Scripps cannot make such a showing on any, and certainly not all, of these mandatory elements.

### B. The Non-Compete Is Not Applicable To Jenn In Her Potential Position As A General Sales Manager

#### 1. The Non-Compete Was Nullified By Later Agreements

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28 (1994). Thus, contractual language must be construed according to its plain and ordinary meaning. *UAW-GM Human Resource Center v KSL Recreation Corp*, 228 Mich App 486, 491 (1998). "[W]hen the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is obviously incomplete 'on its face'. . . ." *Id*. at 502. Therefore, "an integration clause [can] effectively preclude courts from looking outside the contract to interpret the contract. The rasion d'etre of an integration clause is to prohibit consideration of parole evidence by nullifying agreements not included in the written agreement." *Id*. at 507, n 14. As a result, a valid integration clause nullifies "all prior and contemporaneous agreements, understandings, representations, and warranties" so that a party "may not use parol evidence to contradict the explicit terms of the integration clause." *Hamade v Sunoco Inc (R & M)*, 271 Mich App 145, 171 (2006).

---

[2] Likewise, Ohio courts only uphold non-competes "if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v Van Vlerah*, 325 NE2d 544, 544 (Ohio 1975). Under these principles, courts only enforce non-competes, among other things, if "the covenant bars only unfair competition," if "the benefit to the employer is disproportionate to the employee's detriment," if "the covenant destroys the employee's sole means of support," and if the "forbidden employment is merely incidental to the main employment." *Basicomputer Corp v Scott*, 973 F2d 507; 512 (6th Cir 1992).

Here, the Non-Compete was nullified by the later Executive Agreements that Jenn entered into with Scripps. Jenn signed the Non-Compete on January 24, 2020. After Jenn began her employment with Scripps, she entered into an annual Account Executive Agreements with Scripps.[3] Each Account Executive Agreement nullified the terms of the Non-Compete, and all prior agreements between Jenn and Scripps and unambiguously stated that it "shall constitute the entire understanding between the Company and the Participant [and] shall supersede any and all prior understandings between the Company and Participant." **Exhibit D**. The Account Executive Agreement, furthermore, contained a "Non-Solicitation" section which prohibits Scripps' employees "for one (1) year" after their employment from "directly or indirectly, (a) solicit the employment of any person . . . or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Company or any of its parent, subsidiary, or affiliated companies with any user, advertiser customer, supplier or consultant. <u>This does not pertain to lawful solicitation of customers through marketing, advertising and other similar efforts</u>." *Id*. (emphasis added). These provisions remained consistent between the 2020 Account Executive Agreement and the 2021 Account Executive Agreement.

As the Account Executive Agreement nullified the Non-Compete, Scripps cannot enforce the Non-Compete's six-month prohibition on acting as:

a Salesperson or in any other sales-related capacity for:

Any similar business to include, but not limited to: television, radio, newspaper, directory, pure play digital technology company, that will require the Salesperson to conduct business and/or sell digital advertising products within twenty-five (25) miles from the Station's main office.

---

[3] Jenn entered into the Account Executive Agreements in 2020 and 2021. Scripps is in possession of the fully executed copies of all of the Account Executive Agreements.

**Exhibit B**. Instead, Scripps can only enforce Jenn's obligations not to solicit Scripps' employees and not to interfere with Scripps' existing customers. **Exhibit D**. Therefore, as the prohibitions that Scripps seeks to enforce against Jenn in her potential employment as a General Sales Manager in Metro-Detroit was nullified, Jenn can be employed in that position without violating any of her restrictive covenants with Scripps.

### 2. The Non-Compete's Geographic Limitation Does Not Apply To Metro-Detroit

Contracts must be construed according to their ordinary and plain meaning. *Wilie v Auto-Owners Ins Co*, 469 Mich 41, 47 (2003). When contracts are unambiguous, parties "must live by the words of their agreement." *Harbor Park Mkt, Inc v Gronda*, 277 Mich App 126, 131 (2007). "[C]ourts must give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468 (2003). "The court does not have the right to make a different contract for the parties or to look for extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Zurich Ins Co v CCR & Co*, 226 Mich App 559, 604 (1997) (quoting *Michigan Chandelier Co v Morse*, 297 Mich 41, 49 (1941)).

According to the unambiguous terms of the Non-Compete, its geographic limitation is "twenty-five (25) miles from the Station's main office." **Exhibit B**. While the Non-Compete does not define what the "main office" is, it unambiguously defines the "Station" as "Scripps Media Inc. ('Station')." *Id*. Here, Scripps' "main office" is not located anywhere near Detroit – it is in Ohio. Scripps Media Inc. is a foreign company that, <u>on its letterhead</u>, lists its main office as "312

Walnut St. Cincinnati, Ohio 45202." **Exhibit E**.[4] Cincinnati is roughly 250 miles from where Jenn would be employed in Metro-Detroit. Therefore, since Scripps' main office is not in Detroit, but 250 miles away in Ohio, the Non-Compete cannot apply to Jenn's position as a General Sales Manager in Metro-Detroit, and this Court should grant an injunction prohibiting Scripps from attempting to enforce it against Jenn to prohibit her from being able to work in Metro-Detroit.

Furthermore, "[t]he standard for reasonableness of geographic limitations in restrictive covenants is whether they are no greater than reasonably necessary to protect an employer's legitimate business interests." *Kelly Servs, Inc v Mazullo*, 591 F Supp2d 924, 939 (ED Mich 2008). Here, Scripps' 25 mile geographic limitation is not reasonable. If Scripps' 25 mile geographic limitation is applied not to its main office, but to its station in Southfield, then it would preclude Jenn from being able to anywhere in the Metro-Detroit area. Even more egregiously, if the geographic limitation is applied to the station in Southfield, it would preclude Jenn from being able to work out of her home in Clarkston, Michigan. *See* Radius Map (the dot in the north-west corner of the map is the location of Jenn's home), attached as **Exhibit F**. In light of today's climate, where companies are requiring individual to work from home, and there can be severe health risks related to working in an office, a prohibition against Jenn working from her own home is clearly unreasonable.

### 3.   The Non-Compete Is Not Reasonable In Scope of Employment

---

[4] While Scripps is likely to argue that this should apply to the stations it operates in Detroit, the unambiguous terms of the Non-Compete show that that argument is inapposite as it describes the Detroit stations separately, stating that "Station operates a local broadcast television station and affiliated website in Detroit, MI." **Exhibit B**. Since "every word, phrase, and clause in a contract" must be taken into account and not rendered "surplusage or nugatory" and "ambiguities are to be construed against the drafter of the contract," *Klapp*, supra, Scripps cannot escape the fact that the Non-Compete clearly states that it applies only within "twenty-five (25) miles from the Station's main office" – not television stations or locations it operates in Detroit, which it provides a separate description for. **Exhibit B**.

In order to be found enforceable, a non-compete must be reasonable in "the type of employment or line or business." MCL 445.774a(1). "Because the prohibition on all competition is in restraint of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition." *Mapal, Inc v Atarsia*, 147 F Supp 3d, 670, 677 (Ed Mich 2015) (quoting *Innovation Ventures, LLC v Liquid Mfg, LLC*, 2014 WL 5408963, at \*5 (Mich Ct App, Oct 23, 2014), *appeal granted*, 865 NW2d 28 (Mich 2015)). "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against an employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *Id*. (quoting *Capaldi v LiftAid Transp, LLC*, 2006 WL 3019799m at \*4 (Mich Ct App Oct 24, 2006).

In *Mapal, Inc*, the Court held that the Plaintiff's non-competition agreement was unenforceable because it was "overbroad as it relates to the line of business and type of employment it bars [Defendant] from working in." *Id*. at 680. Plaintiff was a company that did business in the "automobile, aerospace, truck, and manufacturing industries." *Id*. at 679. Plaintiff's non-competition agreement prohibited Defendant from working for "a 'direct or indirect' competitor in any capacity" even though Defendant was only involved with Plaintiff's "aerospace and composite fiber industry." *Id*. Because the non-competition agreement prohibited Defendant from "working in the automobile, truck and manufacturing industries, *i.e.*, lines of business and types of employment in which he did not work while employed by Plaintiff" the Court found that "[s]uch overbreadth is impermissible under Michigan law." *Id*. The Court, therefore, found that "Plaintiff [did not] sufficiently allege how the non-compete was aimed at protecting the company from [Defendant] gaining an unfair advantage in competition, rather it operates simply to prevent all competition" and held that the non-competition agreement was invalid. *Id*. at 680.

Like in *Mapal Inc*, the Non-Compete is overly broad and unenforceable as it seeks to prevent all competition from Jenn instead of prohibiting Jenn from having an unfair advantage in competition. During her employment with Scripps, Jenn was an Account Executive that facilitated TV advertising campaigns for a limited number of clients that she was assigned to by Scripps. **Exhibit C** at ¶ 7. Jenn worked independently in this role and did not manage a sales team, hold any other salespeople accountable, or develop and/or refine sales strategies for a team or for Scripps. *Id.* at ¶¶ 8-9. Jenn was not involved with any financial metrics and was not involved, or privy to, any operational decision making for Scripps. *Id.* at ¶¶ 10. Simply put, Jenn, in her role as an Account Executive, was a sales agent that sold television advertising to the clients Scripps assigned her, and her role did not have any managerial responsibilities. Jenn's role with Scripps is significantly different than what her role would be at her new position as a General Sales Manager. Instead of procuring sales for accounts, Jenn would be responsible for the training and development of sales representatives, and for leading a sales team that would focus exclusively on radio advertising. *Id.* at ¶¶ 11-14.[5]

Moreover, the television advertising that Jenn was involved with for Scripps is significantly different than other mediums of advertising and is vastly different than radio advertising. *Id.* at ¶¶ 14-25. Both television and radio advertising differ in the type of advertising unit, cost, reach, demand times, and targetability. *Id.* at ¶ 15. The types of campaigns that are used for each medium vastly differ, as television is a visual medium and radio is only audio. *Id.* at ¶ 16. As a result, the types of businesses that advertise on television and radio are substantially different, and companies use different budgets for their television advertising and radio advertising. *Id.* at ¶¶ 16-17.

---

[5] Jenn's potential management position would not have her act as a "Salesperson" or in a "sales-related capacity," but instead in a management capacity, and therefore does not run afoul of the Non-Compete. **Exhibit B**.

Television is not only extremely expensive when compared to radio, but it focuses on in-home users, as opposed to the more campaign-based radio advertising that focuses on out-of-home, working adults. *Id*. at ¶ 18-19. Television and radio advertising also have different peak, or sought after, periods. *Id*. at ¶ 20. Television's "prime" time is between 8 pm to 10 pm in the evening, while radio's demand is limited to "drive times" – 5 am to 10 am and 3 pm to 7 pm. *Id*. Furthermore, radio advertising is more tailored and targeted, as radio, as a medium, allows the advertiser to format its advertisement to the specific people that listen to the different types of music on a given radio station. *Id*. at ¶ 21.

The method of procuring sales for television advertising is also substantially different, and wholly disconnected, from that of radio advertising. Scripps' television advertising revenue is generated through a request for proposal system ("RFP"). *Id*. at ¶¶ 21-23. This system alerts participating television stations in a given market that there is a budget allocated by an advertiser to purchase airtime for their television ads. *Id*. at ¶ 24. This television RFP system works independently, and separately, from radio – radio stations cannot present their assets, or airtime, on the television RFP system, and television stations cannot present their assets, or airtime, on the radio RFP system. *Id*. at ¶ 25. Thus, television and radio advertising do not compete with one another.

Instead of recognizing the significant different in roles and lines of business that Jenn would be in her new employment, Scripps communicated that it intends to hold her to a Non-Compete that bars her from any position tangentially related to sales for any form of media because the overly-broad Non-Compete covers "television, radio, newspaper, directory, [and] pure play digital technology company." **Exhibit B**. As described above, the television sales position that Jenn had with Scripps is significantly different than the management position for a company

16

involved in radio that Jenn has the potential to be employed by, and the two forms of media do not compete with one another. As in *Mapal Inc*, because the Non-Compete looks to prohibit Jenn from being involved in sales for any form of media – including forms of media that Jenn was never involved with and which do not compete with Specs' television business – it is overly broad and "impermissible under Michigan law." Therefore, because the Non-Compete is overly broad, it should not be allowed to be enforced against Jenn in any employment that is outside of the television sales procurement role that she had with Scripps.

### C.  Jenn Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

The next factor a Court must consider in determining whether to issue a preliminary injunction is whether the Plaintiff would suffer irreparable harm if the requested relief is denied. Courts have routinely found that "[t]he impending loss of her house constitutes irreparable harm." *Homkes v Vilsack*, 2011 WL 1453819, at *2 (WD Mich April 5, 2011), attached as **Exhibit G**. "Generally, because a piece of real property is unique, its loss has been considered irreparable injury." *Sayo, Inc v Zions First Nat Bank*, 2006 WL 3240706, at *2 (ED Mich Nov 7, 2006), attached as **Exhibit H**. Furthermore, "a significant body of case law establishes that 'in certain circumstances the 'threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief.'" *Smith v State Farm Fire and Cas Co*, 737 FSupp2d 702, 714 (ED Mich 2010) (citing *Baumgarten v County of Suffolk*, 2007 WL 1490487, at *5 (EDNY Feb 20, 2007); *Calvango v Bisbal*, 430 FSupp2d 95, 100 (EDNY 2006) (holding that plaintiffs will suffer irreparable harm by losing their only residence)).

Here, if the preliminary injunction is not granted, Jenn will lose her home. **Exhibit C** at ¶¶ 36-37. Jenn currently has no income and is unable to support herself and her family. *Id*. at ¶¶ 29-

35. Jenn's spouse does not earn enough for Jenn and her family to be able to support themselves, or to pay their mortgage. *Id*. at ¶ 35. Because of Scripps' opposition to Jenn's receipt of unemployment, Jenn is unable to receive any unemployment benefits. *Id*. at ¶ 29. Jenn, and her family, are currently living on the money that Jenn has saved and will run out of money well before the 6 month period in the Non-Compete is up. *Id*. at ¶ 36. If Jenn is unable to work, soon, she will be unable to pay for her mortgage, her vehicles, and her children's student loans – she will lose everything, including her house and her vehicles. Because Jenn will be irreparably harmed by Scripps continuing to prohibit Jenn from working, this Court should enjoin Scripps from enforcing the Non-Compete and preventing Jenn from being employed.

### D.  Balance of Harms and Public Interest Favor Granting Injunctive Relief.

In balancing the hardships, a court necessarily considers whether the injury to the plaintiff outweighs the damage an injunction may cause the opposing party. *Stormor, a Div of Fuotia Industries, Inc v Johnson*, 587 F Supp 275, 280 (WD Mich 1984). Here, the balance of potential harms in this case overwhelmingly favors granting injunctive relief. Scripps will not be harmed by not being able to enforce the Non-Compete against Jenn, when Jenn will be in a management role in a field that is substantially different than the one that she was employed with by Scripps. Simply put, Scripps will not be harmed because Jenn will not be competing with Scripps in any real or tangible way. In contrast, Jenn has already lost her livelihood by being terminated from Scripps for its vaccination policy. If Scripps is allowed to keep Jenn out of the labor market, which it has, Jenn will be unable to pay for her mortgage and provide for her family – something which is already in jeopardy, as Jenn is not receiving any income since Scripps has blocked her from receiving any unemployment.

Likewise, in this case it is in the public interest to issue the preliminary injunction. It is in the public interest that individuals be allowed to work and to not default on their loans and mortgage. Furthermore, it is in the public interest that overly broad non-competition agreements that restrict commerce are not enforced. Therefore, because the balance of harms and the public interest is in favor of maintaining these boundaries, this Court should grant Jenn injunctive relief.

## **CONCLUSION**

All of the relevant factors discussed above weigh in favor of granting injunctive relief. Therefore, Jenn requests that this Court enter a Preliminary Injunction against Scripps. A proposed order is attached as **Exhibit A**.

Respectfully submitted,

/s/Benjamin M. Low
Benjamin M. Low (P82834)
JAFFE, RAITT, HEUER & WEISS, P.C.
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI  48034
(248) 351-3000
benlow@jaffelaw.com

Dated: February 2, 2022

19