# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JENNIFER VAN VALLIS-BRIGHT,

     Plaintiff,                           Case No. 22-10227

V                                     Hon. Paul D. Borman

SCRIPPS MEDIA, INC., a foreign company,

     Defendant.

_____

## PLAINTIFFS' EMERGECNY
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Jennifer Van Vallis-Bright ("Jenn") through her counsel, Jaffe, Raitt, Heuer & Weiss, P.C., requests that this Court issue a preliminary injunction against Defendant Scripps Media Inc ("Scripps") pursuant to Fed. R. Civ. P. 65(b), temporarily restraining and enjoining Scripps and anyone acting in concert with it from enforcing a January 24, 2020 non-competition agreement (the "Non-Compete") against Jenn in her employment as a General Sales Manager in Metro-Detroit and grating such other and further relief as the Court deems just and appropriate under the circumstances.

Per Local Rule 65.1, concurrence was sought for this Motion, which was previously filed in the Oakland County Circuit Court. Jenn's filing of this Motion

1

with the Oakland County Circuit Court resulted in gamesmanship from Scripps – leading it to improperly remove this case to Federal Court in an attempt to delay a hearing and ruling on this Motion. As detailed in the accompanying Brief in Support, consideration of this Motion on an **emergency basis** is warranted as Jenn faces irreparable harm, including, but not limited to, defaulting on her mortgage, if the briefing schedule under Local Rule 7.1 is adhered to. Furthermore, while Jenn contests that this case was properly removed to Federal Court, as the amount in controversy does not exceed $75,000, Jenn cannot endure the further delays that would be involved in remanding this case back to the Oakland County Circuit Court. Accordingly, Jenn requests that the Court hear this Motion on an expedited basis.

JAFFE, RAITT, HEUER, & WEISS, P.C.

By: /s/ Benjamin M. Low
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss,PC
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000

Dated: February 4, 2022                    benlow@jaffelaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER VAN VALLIS-BRIGHT,

     Plaintiff,                            Case No. 22-10227

V                                         Hon. Paul D. Borman

SCRIPPS MEDIA, INC., a foreign company,

     Defendant.

_____

**BRIEF IN SUPPORT OF PLAINTIFF'S EMERGECNY MOTION**
**FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

**ISSUES PRESENTED** ........................................................................................ iii

**CONTROLLING OR MOST APPROPRIATE AUTHORITY** ...................... iv

**INDEX OF AUTHORITIES** .............................................................................. v

**INTRODUCTION** ............................................................................................... 1

**STATEMENT OF FACTS** ................................................................................. 3

ARGUMENT                                                    7

   I.  Standard for Granting a Preliminary Injunction ............................................ 7

   II.  Entry of a Preliminary Injunction is Warranted Under The Sixth Circuit's Four-Factor Test ......................................................................................... 8

     A.  Likelihood of Success on the Merits ............................................................ 8

     B.  Jenn Will Suffer Irreparable Harm in the Absence of Injunctive Relief. ... 19

     C.  The Balance of the Harms and Public Interest Are In Favor Of Jenn ........ 20

## <u>ISSUES PRESENTED</u>

1. Should Defendant be enjoined from enforcing an invalid, nullified, and overly broad non-competition agreement against Plaintiff, when Plaintiff seeks employment in a substantially different field than her former employment with Defendant?

   Plaintiff answers: Yes.

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

Fed. R. Civ. P. 65

MCL 445.774a(1)

# INDEX OF AUTHORITIES

## Cases

*Basicomputer Corp v Scott*, 973 F2d 507; 512 (6th Cir 1992) ................................... 9

*Baumgarten v County of Suffolk*, 2007 WL 1490487, at \*5 (EDNY Feb 20, 2007) ................................................................................................................................ 19

*Calvango v Bisbal*, 430 FSupp2d 95, 100 (EDNY 2006) ...................................... 19

*Capaldi v LiftAid Transp, LLC*, 2006 WL 3019799 at \*4 (Mich Ct App Oct 24, 2006) .................................................................................................................. 15

*Coates v Bastian Bros, Inc*, 276 Mich App 498 (2007) ........................................... 8

*Hamade v Sunoco Inc (R & M)*, 271 Mich App 145, 171 (2006) ........................... 10

*Harbor Park Mkt, Inc v Gronda*, 277 Mich App 126, 131 (2007) .......................... 12

*Homkes v Vilsack*, 2011 WL 1453819, at \*2 (WD Mich April 5, 2011) ............... 19

*Innovation Ventures, LLC v Liquid Mfg, LLC*, 2014 WL 5408963, at \*5 (Mich Ct App, Oct 23, 2014), *appeal granted*, 865 NW2d 28 (Mich 2015) ...................... 15

*Jones v. Caruso*, 569 F.3d 258, 270 (6th Cir. 2009) ................................................. 8

*Kelly Servs, Inc v Mazullo*, 591 F Supp2d 924, 939 (ED Mich 2008) ................... 14

*Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468 (2003) ................. 12, 13

*Legatus v. Sebelius*, 988 F.Supp.2d 794, 814 (E.D. Mich. 2013) ........................... 20

*Mapal, Inc v Atarsia*, 147 F Supp 3d, 670, 677 (E.D. Mich. 2015) ............ 14, 15, 16

*Merrill Lynch, Pierce, Fenner & Smith Inc v. Ran*, 67 F.Supp.2d 764, 781 (E.D. Mich. 1999) ................................................................................................. 21

*Michigan Chandelier Co v Morse*, 297 Mich 41, 49 (1941) ................................. 13

*Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 807 (E.D. Mich. 2012) ...................... 7

*Raimonde v Van Vlerah*, 325 NE2d 544, 544 (Ohio 1975) ...................................... 9

*Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28 (1994) ................................... 10

*Sayo, Inc v Zions First Nat Bank*, 2006 WL 3240706, at \*2 (ED Mich Nov 7, 2006), ................................................................................................................... 19

*Smith v State Farm Fire and Cas Co*, 737 FSupp2d 702, 714 (ED Mich 2010) ..... 19

*St Clair Med, PC v Borgiel*, 270 Mich App 260, 266 (2006) ................................... 9

*Stormor, a Div of Fuotia Industries, Inc v Johnson*, 587 F Supp 275, 280 (WD Mich 1984) ........................................................................................................ 20

*UAW-GM Human Resource Center v KSL Recreation Corp*, 228 Mich App 486, 491 (1998) ......................................................................................................... 10

4882-3183-8476

*Wilie v Auto-Owners Ins Co*, 469 Mich 41, 47 (2003) ............................................ 12

*Zurich Ins Co v CCR & Co*, 226 Mich App 559, 604 (1997) .................................. 13

**Statutes**

Fed. R. Civ. P. 65 ..................................................................................................... 7

MCL 445.774a(1) ............................................................................................... 8, 14

## INTRODUCTION

Plaintiff Jennifer Van Vallis-Bright ("Jenn") initiated this lawsuit seeking a declaratory judgment that Defendant Scripps Media Inc. ("Scripps") cannot enforce an overly broad and invalid non-competition agreement (the "Non-Compete") against which is preventing her from working and providing for her family. In an attempt to delay Jenn from being able to seek the relief she is entitled to, Scripps improperly removed this action from the Oakland County Circuit Court to Federal Court, because Jenn sought a preliminary injunction from the Oakland County Circuit Court, after agreeing to set the hearing for her Motion for Preliminary Injunction for February 16, 2021.[1] Scripps' blatant gamesmanship, and improper removal, as there are no damages at stake in this litigation let alone the $75,000 required for the diversity jurisdiction of this Court, is an unjust attempt to grind the legal process to a halt, and increase Jenn's costs, so that Jenn is unable to be gainfully

---

[1] Jenn, despite the irreparable harm she is facing, did so in a showing of good faith as Scripps' counsel requested 14 days before a hearing on the Motion for Preliminary Injunction instead of the 7 days she was entitled to under the Michigan Court Rules. In turn, Scripps' counsel, the next day after the close of business, removed this case to Federal Court to further delay this case with a disingenuous offer for a new "14-day timeframe for a hearing or as soon thereafter as the Court can hear it." The simple fact is that Jenn cannot endure the numerous delays and additional legal costs that Scripps is trying to force upon her – all while fully knowing that there is **no** amount in dispute that gives rise to diversity jurisdiction, as Jenn, not Scripps, is asking for a declaratory judgment that the Non-Compete is invalid. However, due to the harm that Jenn faces, she cannot wait for this case to be remanded back to the Oakland County Circuit Court before receiving a preliminary injunction.

1

employed – all because Jenn had the audacity to try to work with Scripps and ultimately challenged Scripps and its invalid Non-Compete.

Jenn was previously employed by Scripps as an Account Executive and was responsible for direct sales of television advertising to customers that Scripps gave to Jenn. On December 3, 2021, Jenn was terminated from Scripps for not being vaccinated, pursuant to Scripps' Covid-19 vaccination policy. Despite assurances from Scripps that she could obtain a release from her Non-Compete, Scripps has now refused to release her from the Non-Compete and to allow her to work as a General Sales Manager for a company in broadcast radio. Because Jenn needs a release from Scripps in order for her potential employer to employ her, Jenn seeks a ruling that Scripps cannot enforce the Non-Compete against her, as the Non-Compete is invalid for numerous independent reasons, including:

The Non-Compete that Scripps relies upon to prohibit Jenn from being employed was superseded and nullified by Jenn's subsequent agreements with Scripps. After Jenn began her employment with Scripps, and on an annual basis, Jenn entered into Account Executive agreements with Scripps which nullified all of Jenn's previous agreements with Scripps. Because the Account Executive agreements nullified the Non-Compete, Scripps cannot now enforce it against her, and it should be ordered not to enforce it against her in her potential employment as a General Sales Manager.

2

The Non-Compete, on its face, cannot apply to Jenn's potential employment as a General Sales Manager. The Non-Compete only applies to a 25-mile radius from Scripps' main office – which is in Cincinnati, Ohio – and only applies to work as a sales agent or in a sales capacity. Jenn's potential employment is well outside of that 25-mile radius and is in a management, not sales, role. Despite that, Scripps has still threatened to sue Jenn and her potential employer if she begins any employment.

Additionally, the Non-Compete does not meet the strict requirements for enforcement. It is overly broad in its terms and unenforceable, as it seeks to prohibit Jenn from employment in any form of media – not just the form that she was employed by Scripps for, television – despite the significant differences between television advertising and radio advertising.

Because Jenn will be, and is being, irreparably harmed by not being able to be employed, and because she will succeed on her claims that the Non-Compete is invalid, a preliminary injunction should be entered that prohibits Scripps from attempting to enforce the Non-Compete in Jenn's potential role as a General Sales Manager, for a radio company, in Metro-Detroit.

## STATEMENT OF FACTS[2]

Jenn is the primary breadwinner for her family who rely upon her in order to pay for their expenses, which includes their home mortgage. *See* Verified Complaint,

---

[2] Jenn also relies upon the facts contained in her Verified Complaint.

3

ECF No. 1-1, PageID.8 at ¶ 5. Jenn had 30 years of sales experience prior to starting with Scripps. *Id.* at ¶ 48. Prior to January 24, 2020, Jenn was negotiating with Scripps for her employment as an Account Executive for Jenn to have a role selling television advertisements for Scripps. *Id.* at ¶ 7.

On January 24, 2020, Jenn was contacted by Tony Lamerato ("Tony"), Scripps' Director of Sales, to discuss signing a non-competition agreement with Scripps (the "Non-Compete") in connection with her offer to be employed by Scripps. *See* Salesperson Non-Compete Agreement, attached as **Exhibit B**. Jenn, at the time Tony contacted her, she was not at home, but was at the hospital due to her father's illness, and she took Tony's call outside the elevators at the hospital. ECF No. 1-1, PageID.8 at ¶ 9. In their conversation, Tony was adamant that Jenn had to sign the Non-Compete immediately if she wanted to start employment with Scripps the following month. *Id.* at ¶ 10. When Jenn hesitated in responding to Tony, Tony directly informed her that Scripps would not stand in the way of her next career move and implied that Scripps regularly released its employees from the Non-Compete. *Id.* at ¶ 12. Jenn, relying upon Tony's express representations, signed the Non-Compete, believing that Scripps would not stand in the way of her future career choices. *Id.* at ¶ 14.

Jenn was employed by Scripps from February 2020 through December 2021. *Id.* at ¶ 15. During her employment, Jenn was an exemplary employee for Scripps,

and won the Account Executive of the Year Award for 2020 and would have won it in 2021 if she was not terminated, due to the high volume of sales that Jenn generated for Scripps. *Id.* at ¶ 17. Despite that, Scripps terminated Jenn for non-compliance with its Covid-19 vaccination policy on December 3, 2021. *Id.* at ¶¶ 19-31.

Prior to her termination, Jenn continued to close on large sales for Scripps, all while knowing that she would be fired in December. *Id.* at ¶ 33. When her termination date was looming, Jenn contacted Tony and requested his assistance in obtaining a release from the Non-Compete, so that she could continue to support her family. *Id.* at ¶ 26. Tony suggested that Jenn send a formal request to Scripps' HR and Director of Sales, John Cook, to ask for a release. *Id.* at ¶ 27. Jenn did so but was not able to secure a release of the Non-Compete from Scripps, even though she provided them with an alternative, more restrictive, non-competition agreement. *Id.* at ¶ 30. Upon Jenn's discharge, she was informed by Scripps' HR Director, Tamika Heslip, that if she was a finalist for another position, she could email a request to be released from the Non-Compete. Jenn was further informed that she could file and receive unemployment. Both of those statements proved to be false.

Subsequent to her termination, Jenn was offered a position as a General Sales Manager for a company that was in radio broadcasting. *See* Affidavit of Jennifer Van-Vallis Bright, attached as **Exhibit C** at ¶¶ 11-12. The General Sales Manager position was a management role for the potential employer, where Jenn's primary

responsibilities would be to coach and lead a sales team through providing support, leadership, and training to that team. *Id*. at ¶ 12. However, in order to be able to begin employment with that company, Jenn needed to get a release of the Non-Compete from Scripps. *Id*. at ¶ 27.

Because Jenn's potential position as a General Sales Manager in radio was significantly different than her position as an Account Manager for direct television advertising sales, and because Scripps stated that she would not have any problem being released from the Non-Compete, Jenn requested a release, once again, from the Non-Compete. *Id*. at ¶¶ 26-27. Jenn did not receive a release, and, on December 13, 2021, she contacted Scripps through counsel, requesting a release from the Non-Compete. ECF No. 1-1, PageID.8 at ¶ 36. Scripps failed to respond until December 22, 2021, where it asked for more information about the potential General Sales Manager position. *Id*. at ¶ 37. Jenn, through counsel, provided the requested information with a renewed request for a release from the Non-Compete. *Id*. at ¶ 38. Scripps, then, asked for more information on January 3, 2022, which was provided the next day. *Id*. at ¶ 39. However, on January 12, 2022, Scripps responded with a flat out rejection of Jenn's request and threatened to sue Jenn's potential employer for tortious interference – all while knowing that Jenn had done everything possible to work with Scripps. *Id*. at 40.

On February 2, 2022, Jenn brought suit in the Oakland County Circuit Court against Scripps, as Scripps refused to work with, or reach an amicable resolution with Jenn. Jenn agreed to a 14 day briefing schedule for her Motion for Preliminary Injunction which she filed in Oakland County, in a showing of good faith since Scripps requested it. In response, Scripps, after the close of business the next day, improperly removed this case to Federal Court.

Now, Jenn is unable to work and is unable to support her family. **Exhibit C** at ¶¶ 28-31. Jenn is running out of savings, and will not be able to pay for her, and her family's, essentials very soon – including their mortgage, which will result in Jenn losing her home. *Id*. at ¶¶ 33, 35-37. Because Jenn is being irreparably harmed, Jenn seeks an order from this Court that will prohibit Scripps from enforcing the invalid Non-Compete against her, so that she can be gainfully employed and so that she can support her family.

## ARGUMENT

### I.    Standard for Granting a Preliminary Injunction

The Sixth Circuit has established a four-factor test to determine whether a preliminary injunction should be issued under Fed. R. Civ. P. 65.[3] Those factors are: (1) the likelihood that the movant will succeed on the merits; (2) whether the movant

---

[3] "The factors to be weighed before issuing a TRO are the same as those considered for issuing a preliminary injunction." *Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 807 (E.D. Mich. 2012).

4882-3183-8476

will suffer irreparable harm if the injunction is not granted; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the injunction advances the public interest. *Jones v. Caruso*, 569 F.3d 258, 270 (6th Cir. 2009). In moving for a preliminary injunction, Jenn merely seeks to be able to work and to be able to provide for her family – something which is in extreme jeopardy as Jenn is currently unable to work due to Scripps' threats about the Non-Compete and Scripps' opposition to Jenn's receipt of unemployment.

## II.   Entry of a Preliminary Injunction is Warranted Under The Sixth Circuit's Four-Factor Test

### A.   Likelihood of Success on the Merits

In her claim for a Declaratory Judgment, Jenn seeks a ruling from this Court that the Non-Compete is not enforceable against her in her potential position as a General Sales Manager for a company in a separate line of work at a location which is more than 25 miles from Scripps' main office. Michigan courts generally disfavor covenants not to compete and view them as restraints on commerce that are only enforceable to the extent that they are reasonable. A reasonable non-compete protects against the employee gaining an unfair advantage in competition with the employer but does not prohibit the employee from using general knowledge or skill. *Coates .v Bastian Bros., Inc.*, 276 Mich. App. 498 (2007). MCL 445.774a(1) provides that:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment in a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Consequently, Scripps has the burden to show that the Non-Compete (1) existed for an honest and just purpose; (2) was established for the protection of its competitive business interests; (3) was reasonable as to duration, geographical area, and scope of employment; and (4) was not injurious to the public; and (5) that any breach caused injury to Scripps. *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 266 (2006).[4] Scripps cannot make such a showing on any, and certainly not all, of these mandatory elements.

### 1. The Non-Compete Is Not Applicable To Jenn In Her Potential Position As A General Sales Manager

---

[4] Likewise, Ohio courts only uphold non-competes "if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 544 (Ohio 1975). Under these principles, courts only enforce non-competes, among other things, if "the covenant bars only unfair competition," if "the benefit to the employer is disproportionate to the employee's detriment," if "the covenant destroys the employee's sole means of support," and if the "forbidden employment is merely incidental to the main employment." *Basicomputer Corp. v. Scott*, 973 F.2d. 507; 512 (6th Cir. 1992).

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n. 28 (1994). Thus, contractual language must be construed according to its plain and ordinary meaning. *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich. App. 486, 491 (1998). "[W]hen the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is obviously incomplete 'on its face'. . . ." *Id*. at 502. Therefore, "an integration clause [can] effectively preclude courts from looking outside the contract to interpret the contract. The rasion d'etre of an integration clause is to prohibit consideration of parole evidence by nullifying agreements not included in the written agreement." *Id*. at 507, n 14. As a result, a valid integration clause nullifies "all prior and contemporaneous agreements, understandings, representations, and warranties" so that a party "may not use parol evidence to contradict the explicit terms of the integration clause." *Hamade v. Sunoco Inc. (R. & M.)*, 271 Mich. App. 145, 171 (2006).

Here, the Non-Compete was nullified by the later Executive Agreements that Jenn entered into with Scripps. Jenn signed the Non-Compete on January 24, 2020. After Jenn began her employment with Scripps, she entered into an annual Account

Executive Agreements with Scripps.[5] Each Account Executive Agreement nullified the terms of the Non-Compete, and all prior agreements between Jenn and Scripps and unambiguously stated that it "shall constitute the entire understanding between the Company and the Participant [and] shall supersede any and all prior understandings between the Company and Participant." **Exhibit D**. The Account Executive Agreement, furthermore, contained a "Non-Solicitation" section which prohibits Scripps' employees "for one (1) year" after their employment from "directly or indirectly, (a) solicit the employment of any person . . . or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Company or any of its parent, subsidiary, or affiliated companies with any user, advertiser customer, supplier or consultant. <u>This does not pertain to lawful solicitation of customers through marketing, advertising and other similar efforts</u>." *Id.* (emphasis added). These provisions remained consistent between the 2020 Account Executive Agreement and the 2021 Account Executive Agreement.

As the Account Executive Agreement nullified the Non-Compete, Scripps cannot enforce the Non-Compete's six-month prohibition on acting as:

a Salesperson or in any other sales-related capacity for:

---

[5] Jenn entered into the Account Executive Agreements in 2020 and 2021. Scripps is in possession of the fully executed copies of all of the Account Executive Agreements.

> Any similar business to include, but not limited to: television, radio, newspaper, directory, pure play digital technology company, that will require the Salesperson to conduct business and/or sell digital advertising products within twenty-five (25) miles from the Station's main office.

**Exhibit B**. Instead, Scripps can only enforce Jenn's obligations not to solicit Scripps' employees and not to interfere with Scripps' existing customers. **Exhibit D**. Therefore, as the prohibitions that Scripps seeks to enforce against Jenn in her potential employment as a General Sales Manager in Metro-Detroit was nullified, Jenn can be employed in that position without violating any of her restrictive covenants with Scripps.

### 2. The Non-Compete's Geographic Limitation Does Not Apply To Metro-Detroit

Contracts must be construed according to their ordinary and plain meaning. *Wilie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47 (2003). When contracts are unambiguous, parties "must live by the words of their agreement." *Harbor Park Mkt., Inc. v. Gronda*, 277 Mich. App. 126, 131 (2007). "[C]ourts must give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins. Group Agency, Inc.*, 468 Mich. 459, 468 (2003). "The court does not have the right to make a different contract for the parties or to look for extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a

definite meaning." *Zurich Ins. Co. v. CCR. & Co.*, 226 Mich. App. 559, 604 (1997) (quoting *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49 (1941)).

According to the unambiguous terms of the Non-Compete, its geographic limitation is "twenty-five (25) miles from the Station's main office." **Exhibit B**. While the Non-Compete does not define what the "main office" is, it unambiguously defines the "Station" as "Scripps Media Inc. ('Station')." *Id*. Here, Scripps' "main office" is not located anywhere near Detroit – it is in Ohio. Scripps Media Inc. is a foreign company that, on its letterhead, lists its main office as "312 Walnut St. Cincinnati, Ohio 45202." **Exhibit E**.[6] Cincinnati is roughly 250 miles from where Jenn would be employed in Metro-Detroit. Therefore, since Scripps' main office is not in Detroit, but 250 miles away in Ohio, the Non-Compete cannot apply to Jenn's position as a General Sales Manager in Metro-Detroit, and this Court should grant an injunction prohibiting Scripps from attempting to enforce it against Jenn to prohibit her from being able to work in Metro-Detroit.

---

[6] While Scripps is likely to argue that this should apply to the stations it operates in Detroit, the unambiguous terms of the Non-Compete show that that argument is inapposite as it describes the Detroit stations separately, stating that "Station operates a local broadcast television station and affiliated website in Detroit, MI." **Exhibit B**. Since "every word, phrase, and clause in a contract" must be taken into account and not rendered "surplusage or nugatory" and "ambiguities are to be construed against the drafter of the contract," *Klapp*, supra, Scripps cannot escape the fact that the Non-Compete clearly states that it applies only within "twenty-five (25) miles from the Station's main office" – not television stations or locations it operates in Detroit, which it provides a separate description for. **Exhibit B**.

Furthermore, "[t]he standard for reasonableness of geographic limitations in restrictive covenants is whether they are no greater than reasonably necessary to protect an employer's legitimate business interests." *Kelly Servs., Inc. v. Mazullo*, 591 F. Supp.2d. 924, 939 (E.D. Mich. 2008). Here, Scripps' 25 mile geographic limitation is not reasonable. If Scripps' 25 mile geographic limitation is applied not to its main office, but to its station in Southfield, then it would preclude Jenn from being able to anywhere in the Metro-Detroit area. Even more egregiously, if the geographic limitation is applied to the station in Southfield, it would preclude Jenn from being able to work out of her home in Clarkston, Michigan. *See* Radius Map (the dot in the north-west corner of the map is the location of Jenn's home), attached as **Exhibit F**. In light of today's climate, where companies are requiring individual to work from home, and there can be severe health risks related to working in an office, a prohibition against Jenn working from her own home is clearly unreasonable.

### 3. The Non-Compete Is Not Reasonable In Scope of Employment

In order to be found enforceable, a non-compete must be reasonable in "the type of employment or line or business." MCL 445.774a(1). "Because the prohibition on all competition is in restraint of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition." *Mapal, Inc. v. Atarsia*, 147 F. Supp. 3d., 670, 677 (E.D. Mich. 2015)

(quoting *Innovation Ventures, LLC. v. Liquid Mfg., LLC.*, 2014 WL 5408963, at \*5 (Mich. Ct. App., Oct. 23, 2014), *appeal granted*, 865 N.W.2d. 28 (Mich. 2015)). "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against an employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *Id*. (quoting *Capaldi v. LiftAid Transp, LLC.*, 2006 WL 3019799 at \*4 (Mich. Ct. App. Oct. 24, 2006)).

In *Mapal, Inc.*, the Court held that the Plaintiff's non-competition agreement was unenforceable because it was "overbroad as it relates to the line of business and type of employment it bars [Defendant] from working in." *Id*. at 680. Plaintiff was a company that did business in the "automobile, aerospace, truck, and manufacturing industries." *Id*. at 679. Plaintiff's non-competition agreement prohibited Defendant from working for "a 'direct or indirect' competitor in any capacity" even though Defendant was only involved with Plaintiff's "aerospace and composite fiber industry." *Id*. Because the non-competition agreement prohibited Defendant from "working in the automobile, truck and manufacturing industries, *i.e.*, lines of business and types of employment in which he did not work while employed by Plaintiff" the Court found that "[s]uch overbreadth is impermissible under Michigan law." *Id*. The Court, therefore, found that "Plaintiff [did not] sufficiently allege how the non-compete was aimed at protecting the company from [Defendant] gaining an

unfair advantage in competition, rather it operates simply to prevent all competition" and held that the non-competition agreement was invalid. *Id*. at 680.

Like in *Mapal Inc.*, the Non-Compete is overly broad and unenforceable as it seeks to prevent all competition from Jenn instead of prohibiting Jenn from having an unfair advantage in competition. During her employment with Scripps, Jenn was an Account Executive that facilitated TV advertising campaigns for a limited number of clients that she was assigned to by Scripps. **Exhibit C** at ¶ 7. Jenn worked independently in this role and did not manage a sales team, hold any other salespeople accountable, or develop and/or refine sales strategies for a team or for Scripps. *Id*. at ¶¶ 8-9. Jenn was not involved with any financial metrics and was not involved, or privy to, any operational decision making for Scripps. *Id*. at ¶¶ 10. Simply put, Jenn, in her role as an Account Executive, was a sales agent that sold television advertising to the clients Scripps assigned her, and her role did not have any managerial responsibilities. Jenn's role with Scripps is significantly different than what her role would be at her new position as a General Sales Manager. Instead of procuring sales for accounts, Jenn would be responsible for the training and development of sales representatives, and for leading a sales team that would focus exclusively on radio advertising. *Id*. at ¶¶ 11-14.[7]

_____

[7] Jenn's potential management position would not have her act as a "Salesperson" or in a "sales-related capacity," but instead in a management capacity, and therefore does not run afoul of the Non-Compete. **Exhibit B**.

16

Moreover, the television advertising that Jenn was involved with for Scripps is significantly different than other mediums of advertising and is vastly different than radio advertising. *Id*. at ¶¶ 14-25. Both television and radio advertising differ in the type of advertising unit, cost, reach, demand times, and targetability. *Id*. at ¶ 15. The types of campaigns that are used for each medium vastly differ, as television is a visual medium and radio is only audio. *Id*. at ¶ 16. As a result, the types of businesses that advertise on television and radio are substantially different, and companies use different budgets for their television advertising and radio advertising. *Id*. at ¶¶ 16-17. Television is not only extremely expensive when compared to radio, but it focuses on in-home users, as opposed to the more campaign-based radio advertising that focuses on out-of-home, working adults. *Id*. at ¶ 18-19. Television and radio advertising also have different peak, or sought after, periods. *Id*. at ¶ 20. Television's "prime" time is between 8 pm to 10 pm in the evening, while radio's demand is limited to "drive times" – 5 am to 10 am and 3 pm to 7 pm. *Id*. Furthermore, radio advertising is more tailored and targeted, as radio, as a medium, allows the advertiser to format its advertisement to the specific people that listen to the different types of music on a given radio station. *Id*. at ¶ 21.

The method of procuring sales for television advertising is also substantially different, and wholly disconnected, from that of radio advertising. Scripps' television advertising revenue is generated through a request for proposal system

17

("RFP"). *Id.* at ¶¶ 21-23. This system alerts participating television stations in a given market that there is a budget allocated by an advertiser to purchase airtime for their television ads. *Id.* at ¶ 24. This television RFP system works independently, and separately, from radio – radio stations cannot present their assets, or airtime, on the television RFP system, and television stations cannot present their assets, or airtime, on the radio RFP system. *Id.* at ¶ 25. Thus, television and radio advertising do not compete with one another.

Instead of recognizing the significant different in roles and lines of business that Jenn would be in her new employment, Scripps communicated that it intends to hold her to a Non-Compete that bars her from any position tangentially related to sales for any form of media because the overly-broad Non-Compete covers "television, radio, newspaper, directory, [and] pure play digital technology company." **Exhibit B**. As described above, the television sales position that Jenn had with Scripps is significantly different than the management position for a company involved in radio that Jenn has the potential to be employed by, and the two forms of media do not compete with one another. As in *Mapal Inc.*, because the Non-Compete looks to prohibit Jenn from being involved in sales for any form of media – including forms of media that Jenn was never involved with and which do not compete with Specs' television business – it is overly broad and "impermissible under Michigan law." Therefore, because the Non-Compete is overly broad, it

should not be allowed to be enforced against Jenn in any employment that is outside of the television sales procurement role that she had with Scripps.

**B.  Jenn Will Suffer Irreparable Harm in the Absence of Injunctive Relief.**

The next factor a Court must consider in determining whether to issue a preliminary injunction is whether the Plaintiff would suffer irreparable harm if the requested relief is denied. Courts have routinely found that "[t]he impending loss of her house constitutes irreparable harm." *Homkes v. Vilsack*, 2011 WL 1453819, at *2 (W.D. Mich. April 5, 2011), attached as **Exhibit G**. "Generally, because a piece of real property is unique, its loss has been considered irreparable injury." *Sayo, Inc. v. Zions First Nat. Bank*, 2006 WL 3240706, at *2 (E.D. Mich. Nov. 7, 2006), attached as **Exhibit H**. Furthermore, "a significant body of case law establishes that 'in certain circumstances the 'threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief.'" *Smith v. State Farm Fire and Cas. Co.*, 737 F.Supp.2d. 702, 714 (E.D. Mich. 2010) (citing *Baumgarten v. County of Suffolk*, 2007 WL 1490487, at *5 (E.D.N.Y. Feb. 20, 2007); *Calvango v. Bisbal*, 430 F.Supp.2d. 95, 100 (E.D.N.Y. 2006) (holding that plaintiffs will suffer irreparable harm by losing their only residence)).

Here, if the preliminary injunction is not granted, Jenn will lose her home. **Exhibit C** at ¶¶ 36-37. Jenn currently has no income and is unable to support herself

and her family. *Id*. at ¶¶ 29-35. Jenn's spouse does not earn enough for Jenn and her family to be able to support themselves, or to pay their mortgage. *Id*. at ¶ 35. Because of Scripps' opposition to Jenn's receipt of unemployment, Jenn is unable to receive any unemployment benefits. *Id*. at ¶ 29. Jenn, and her family, are currently living on the money that Jenn has saved and will run out of money well before the 6 month period in the Non-Compete is up. *Id*. at ¶ 36. If Jenn is unable to work, soon, she will be unable to pay for her mortgage, her vehicles, and her children's student loans – she will lose everything, including her house and her vehicles. Because Jenn will be irreparably harmed by Scripps continuing to prohibit Jenn from working, this Court should enjoin Scripps from enforcing the Non-Compete and preventing Jenn from being employed.

> **C.** **The Balance of the Harms and Public Interest Are In Favor Of Jenn**

The Court must also consider whether the harm to Jenn "outweighs any potential harm to the defendant if the injunction is issued." *Legatus v. Sebelius*, 988 F.Supp.2d 794, 814 (E.D. Mich. 2013). This balance tips in favor of Jenn.

In balancing the hardships, a court necessarily considers whether the injury to the plaintiff outweighs the damage an injunction may cause the opposing party. *Stormor, a Div. of Fuotia Industries, Inc. v. Johnson*, 587 F. Supp. 275, 280 (W.D. Mich. 1984). Here, the balance of potential harms in this case overwhelmingly favors granting injunctive relief. Scripps will not be harmed by not being able to

enforce the Non-Compete against Jenn, when Jenn will be in a management role in a field that is substantially different than the one that she was employed with by Scripps. Simply put, Scripps will not be harmed because Jenn will not be competing with Scripps in any real or tangible way. In contrast, Jenn has already lost her livelihood by being terminated from Scripps for its vaccination policy. If Scripps is allowed to keep Jenn out of the labor market, which it has, Jenn will be unable to pay for her mortgage and provide for her family – something which is already in jeopardy, as Jenn is not receiving any income since Scripps has blocked her from receiving any unemployment.

Likewise, in this case it is in the public interest to issue the preliminary injunction. It is in the public interest that individuals be allowed to work and to not default on their loans and mortgage. Furthermore, it is in the public interest that overly broad non-competition agreements that restrict commerce are not enforced. Therefore, because the balance of harms and the public interest is in favor of maintaining these boundaries, this Court should grant Jenn injunctive relief.

Additionaly, courts have also recognized that the public has an interest in the enforcement of valid agreements. In *Merrill Lynch, Pierce, Fenner & Smith Inc v. Ran*, 67 F.Supp.2d 764, 781 (E.D. Mich. 1999), the court explained why enforcement of agreements are beneficial to the public:

> Unless the court enforces the terms of the contracts entered into by the
> sophisticated parties and entities in this case, the court will be

21

undermining the legitimate business expectations not only of the parties here, but of all contracting parties. . . . Without such a rule of law, parties could not rely on contracts to conduct their affairs.

Here, it is in the public interest for the Court to enforce the actual non-competition and non-solicitation obligations Jenn has with Scripps that are in the Account Executive Agreements, and not the nullified Non-Compete.

## <u>CONCLUSION</u>

All of the relevant factors discussed above weigh in favor of granting injunctive relief. Therefore, Jenn requests that this Court enter a Preliminary Injunction against Scripps. A proposed order is attached as **Exhibit A**.

Respectfully submitted,

By: /s/ Benjamin M. Low
Benjamin M. Low (P82834)
Jaffe Raitt Heuer & Weiss,PC
*Attorneys for Plaintiff*
27777 Franklin Road, Suite 2500
Southfield, MI 48034
248.351.3000
Dated: February 4, 2022            benlow@jaffelaw.com

22

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JENNIFER VAN VALLIS-BRIGHT,

      Plaintiff,                              Case No. 22-10227

V                                       Hon. Paul D. Borman

SCRIPPS MEDIA, INC., a foreign company,

      Defendant.

_____

### <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that on February 4, 2022 the foregoing ***Plaintiff's Motion for Preliminary Injunction and supporting brief*** was filed with the Court using the ECF system which will send notification of such filing to counsel of record.

                                      /s/ Benjamin M. Low
                                      benlow@jaffelaw.com

4882-3183-8476