UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER VAN VALLIS-BRIGHT,

        Plaintiff,                       Case No. 2:22-cv-10227

v.                                  Paul D. Borman
                                    United States District Judge

SCRIPPS MEDIA, INC.,

        Defendant.

_____/

**OPINION AND ORDER REMANDING THIS CASE TO STATE COURT**

**INTRODUCTION**

Plaintiff Jennifer Van Vallis-Bright filed suit against Defendant Scripps Media, Inc. in the Circuit Court for the County of Oakland. Scripps removed the case, claiming that this Court has diversity jurisdiction over it. After Vallis-Bright contended that Scripps could not satisfy the amount in controversy requirement, the Court held a hearing on the issue on February 14, 2022. For the reasons set forth below, the Court finds that Scripps has not proven by a preponderance of the evidence that the amount in controversy exceeds $75,000. Therefore, the Court does not have subject matter jurisdiction and must **REMAND** this case.

## I.    PROCEDURAL HISTORY

### 1. Complaint

On February 2, 2022, Plaintiff Jennifer Van Vallis-Bright filed a Complaint against Defendant Scripps Media, Inc. in the Circuit Court for the County of Oakland. (ECF No. 1-1.) In this Complaint, Vallis-Bright alleged that she was employed as a salesperson with Scripps from February 2020 until December 3, 2021, when she was fired for not complying with Scripps' COVID-19 vaccination policy. (ECF No. 1-1, PageID 10–12.) She also alleged that, shortly before she began her employment with Scripps, she signed a Non-Compete Agreement that provided, among other things, that:

> At such time as Salesperson may leave the Station's employment for any reason, voluntary or involuntary, Salesperson understands and agrees that Salesperson shall not communicate or disclose Confidential Information to any other person or entity in any matter, directly or indirectly.

> At such time as salesperson may leave the Station's employment for any reason, voluntary or involuntary, Salesperson understands and agrees that as a condition for Station entering into the Agreement and Salesperson's employment, Salesperson may not perform services as a Salesperson or in any other sales-related capacity for:
> - o Any similar business to include, but not limited to: television, radio, newspaper, directory, pure play digital technology company, that will require the Salesperson to conduct business and/or sell digital advertising products within twenty-five (25) miles from the Station's main office
> - o Any solicited client that was contacted while employed at the Station, or for whom a lead was generated
>
> This Agreement shall be in effect for six (6) months from the date of the termination of Salesperson's employment.

2

> You agree that upon termination of your employment, and for one (1) year thereafter, you shall not, directly or indirectly, (a) employ or solicit the employment of any person who is then or has been within six (6) months prior to your termination, an employee of the Station or any of its affiliated companies; or (b) interfere with, disturb or interrupt the relationships (regardless of whether such relationships have been reduced to formal contracts) of the Station or any of its affiliated companies with any user, advertiser, customer, supplier or consultant.

(ECF No. 1-1, PageID 21.) (paragraph numbers removed)

Additionally, Vallis-Bright's Complaint stated that she "found a position with another company in management, not sales . . . that would allow her to work remotely, from . . . Clarkston, Michigan" and "requested release from the Non-Compete," "explain[ing] how her potential new position would not compete with Scripps." (ECF No. 1-1, PageID 12–13.) But, according to Vallis-Bright, Scripps refused to release her. (ECF No. 1-1, PageID 14.) As a result, Vallis-Bright claimed, she "is unable to produce, her family is unable to pay their household expenses, and are unable to pay for their home." (ECF No. 1-1, PageID 9.)

The only remedy Vallis-Bright requested was Declaratory Relief. (ECF No. 1-1, PageID 16.) Specifically, she asked the circuit court to declare that the Non-Compete "does not apply to her being employed as a General Sales Manager at a location more than 25 miles from Scripps' main office in Cincinnati, Ohio, and that even if [] the terms applied to the new position, the Non-Compete is illegal, void,

invalid, and unenforceable under applicable laws and public policy." (ECF No. 1-1, PageID 14.)

**2. Notice of Removal**

The next day, February 3, Scripps removed the case to this Court under 28 U.S.C. § 1441. (ECF No. 1[1]; ECF No. 6, PageID 144.) In its Notice of Removal, Scripps asserted that this Court has "subject matter jurisdiction over [Vallis-Bright]'s Complaint based on diversity of citizenship under 28 U.S.C. § 1332(a)." (ECF No. 6, PageID 141.) It noted that § 1332's diversity of citizenship requirement is satisfied because Vallis-Bright "is a citizen of Michigan" and "Scripps is a citizen of Ohio and Delaware." (ECF No. 6, 142.)

Then Scripps asserted that § 1332's requirement that there be over $75,000 in controversy is satisfied. It explained that "'the amount in controversy is . . . the value of the consequences which may result from the litigation.'" (ECF No. 6, PageID 142.) (quoting *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 253 (6th Cir. 2011)) And from this standard, it argued:

> The value of the consequences of this litigation greatly exceeds $75,000, exclusive of interest and costs. The Plaintiff is trying to invalidate—and thus deprive Defendants of the benefits of—an agreement that includes non-competition, confidentiality, and non-solicitation clauses. Defendant paid Vallis-Bright far in excess of $75,000 in wages and commissions as an advertising sales executive

[1] Scripps' original Notice of Removal was stricken because the font was too small. (ECF No. 5.) Scripps filed a corrected Notice of Removal on February 4. (ECF No. 6.)

over her several years of employment, and her continued employment was conditioned on her acceptance of the agreement. Vallis-Bright was personally responsible for generating sales revenue and profits far in excess of $75,000; as Vallis-Bright herself alleges, in the two months prior to the end of her Scripps employment, she generated "significant sales for Scripps, including, but not limited to, a $325,000 deal...." Compl. ¶ 34.

Here, Plaintiff's declaratory judgment action, if successful, would invalidate her agreement—allowing her to take a job with an entity that (contrary to Plaintiff's allegations) directly competes with Scripps for the same limited pool of dollars spent by advertisers in the Metro Detroit area. By invalidating the agreement, Plaintiff would thus have no contractual restriction from soliciting Scripps' current advertisers, or from using Scripps' confidential information and goodwill generated as a Scripps employee to compete with, undercut, or otherwise divert advertising business away from Scripps and towards her new employer.

(ECF No. 6, PageID 143.) (paragraph numbers omitted)

### 3. Additional Filings

One day later, on February 4, 2022 Vallis-Bright filed an Emergency Motion for Preliminary Injunction to "prohibit Scripps from enforcing the invalid Non-Compete against her, so that she can be gainfully employed and so that she can support her family." (ECF No. 4, PageID 81.) Vallis-Bright also asked for an expedited briefing schedule because she "faces irreparable harm, including, but not limited to, defaulting on her mortgage, if the briefing schedule under Local Rule 7.1 is adhered to." (ECF No. 4, PageID 68.)

Significantly, Vallis-Bright contended that "there are no damages at stake in this litigation let alone the $75,000 required for the diversity jurisdiction of this

Court." (ECF No. 4, PageID 75.) But she appeared to attempt to waive any objection to this Court's lack of subject matter jurisdiction, emphasizing that she "cannot endure the further delays that would be involved in remanding this case back to the Oakland County Circuit Court." (ECF No. 4, PageID 68.)

Four days after that, on February 8, 2022 Scripps filed an Emergency Motion for Limited Expedited Early Discovery. (ECF No. 7.) In this Emergency Motion, Scripps stated that it had discovered—from Vallis-Bright's counsel and LinkedIn—that Vallis-Bright "did not even have a firm job offer" from her purported potential new employer, Audacy, and that it was not clear that Vallis-Bright could even work for Audacy, because Audacy appears to have a COVID-19 vaccination requirement. (ECF No. 7, PageID 148.) Scripps moved the Court to require Vallis-Bright to provide: all of her correspondence with Audacy; medical records to support any COVID-19 vaccination policy exemption that she may have received; and documents to support her claim that she will lose her home if the Court does not grant the Preliminary Injunction that she has requested. (ECF No. 7-2, PageID 160–61.)

### 4. Subject Matter Jurisdiction Hearing

On February 10, 2022 this Court set a hearing for February 14 at 11:00 AM "on the issue of whether the amount in controversy requirement for subject matter jurisdiction is satisfied in this case." (ECF No. 8, PageID 186–87.) The next day,

February 11, 2022, both parties filed pre-Hearing Memoranda, and on February 14, 2022, Scripps filed a Supplemental pre-Hearing Memorandum. (ECF Nos. 9, 10.) The Hearing took place at the scheduled time.

## II.   LEGAL STANDARD

Courts "have an 'independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party,'" *Copen v. United States*, 3 F.4th 875, 879 (6th Cir. 2021) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)). Indeed, "[n]othing is to be more jealously guarded by a court than its jurisdiction." *Chrysler Grp. LLC v. South Holland Dodge, Inc.*, Nos. 10-12984, 10-13290, 10-13908, 2015 WL 4429456 (E.D. Mich. July 20, 2015) (internal quotation marks omitted).

A defendant seeking to remove a case from state to federal court on the basis of diversity jurisdiction must "show by a preponderance of the evidence that the allegations in the complaint at the time of removal satisfy the amount-in-controversy requirement."[2] *Northup Props., Inc. v. Chesapeake Appalachia, L.L.C.*, 567 F.3d

---

[2] In contrast,

> The rule governing dismissal for want of jurisdiction in cases *brought* in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a *legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal.

767, 769–70 (6th Cir. 2009). While the defendant's "notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold," if "the plaintiff contests, or the court questions, the defendant's allegation," then "evidence establishing the amount is required by § 1446(c)(2)(B)." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

"[F]or actions seeking a declaratory judgment, we measure the amount in controversy by 'the value of the object of the litigation.'" *Northup Props., Inc.*, 567 F.3d at 770 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). In other words, "where a party seeks a declaratory judgment, the amount in controversy is not necessarily the money judgment sought or recovered, but rather the value of the consequences which may result from the litigation." *Freeland v. Liberty Mut. Fire Ins. Co.*, 632 F.3d 250, 253 (6th Cir. 2011).

"The Sixth Circuit has not yet [definitively] resolved whether it 'view[s] the amount in controversy from the perspective of the plaintiff or the defendant.'" *K2 Holdings, LLC v. New Cingular Wireless, PCS, LLC*, No. 5:16-CV-134-KKC, 2017 WL 1134398, at *4 (E.D. Ky. Mar. 27, 2017) (quoting *Northup Props., Inc.*, 567

---

*St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938) (emphasis). This "legal certainty" rule also applies to removed cases "where the plaintiff's prayer for damages in the state suit exceeds the federal amount-in-controversy requirement." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 157 (6th Cir. 1992), abrogated on other grounds by *Hertz Corp. v. Friend*, 559 U.S. 77 (2010) (citing *St. Paul Mercury Indem. Co.*, 303 U.S. at 290–91).

F.3d at 770 n.1); *see also Transtar Indus., LLC v. Lester*, No. 19-cv-1230, 2019 WL 2410855, at *2 (N.D. Ohio June 7, 2019) ("Courts dispute from whose perspective the 'value of the object of the litigation' must be determined from . . . ."). But on balance, this Circuit appears to have "a preference for the plaintiff's perspective." *Tigrett v. De Vos*, 20-cv-1268, 2021 WL 1156626, at *4 (W.D. Tenn. Mar. 26, 2021) (quoting *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 407 (6th Cir. 2007) ("It is generally agreed in this circuit, that the amount in controversy should be determined from the perspective of the plaintiff, with a focus on the economic value of the rights he seeks to protect.")); *see also Adelman's Truck Parts Corp. v. Jones Transp.*, 797 F. App'x 997, 1000 (6th Cir. 2020) (holding, in a removal case, that "[t]he amount in controversy should be considered from the perspective of the plaintiff" (internal quotation marks and citation omitted)); *Generation Mobile Preferred, LLC v. Roye Holdings*, LLC, No. 20-MC-51512, 2022 WL 252176, at *3 (E.D. Mich. Jan. 26, 2022) (same (quoting *Woodmen of the Word/Omaha v. Scarbo*, 129 F. App'x 194, 195–96 (6th Cir. 2005))).[3] And both parties focused on the

---

[3] The Sixth Circuit decision in *Freeland*—the authority relied on by Scripps in its Notice of Removal—does not directly address whether to adopt the plaintiff's or defendant's perspective. It did not need to do so, because it involved an insured couple's request for a declaration that it could receive a sum from its insurer, and thus the outcome of the case necessarily held the same value, in opposite force, to both parties. But the Court notes that *Freeland*'s language focuses on "what the [*plaintiffs*] would receive" if they prevailed. *Freeland*, 632 F.3d at 254; *see also id.* at 253 ("[i]f the [plaintiffs] prevail . . ."). In that sense, it too hints at a preference for the plaintiff's perspective.

plaintiff's perspective at the Hearing. Accordingly, this Court will examine the amount in controversy from the perspective of the plaintiff.

Finally, "[w]hile exact precision is not required, the value of declaratory relief must be 'sufficiently measurable.'" *Blaszczyk v. Darby*, 425 F. Supp. 3d 841, 852 (E.D. Mich. 2019); *see also Cernelle v. Graminex, L.L.C.*, 437 F. Supp. 3d 574, 593 (E.D. Mich. 2020) ("the value of equitable relief must be 'sufficiently measurable and certain' to satisfy the amount-in-controversy requirement" (internal quotation marks and alterations omitted)).

## III. ANALYSIS

Scripps has advanced three arguments for why it has satisfied the amount in controversy requirement, as examined from Vallis-Bright's perspective: 1) Vallis-Bright's house is worth more than the threshold amount; 2) the sales and revenue that Vallis-Bright generated for Scripps exceeds that amount; and 3) Vallis-Bright would earn more than that amount at her new position. The Court finds that none of these arguments proves by a preponderance of the evidence that the value of the object of this litigation is over $75,000.

### 1. The value of Vallis-Bright's home is irrelevant to the amount in controversy.

First, Scripps argued that the value of Vallis-Bright's home is "in controversy" here. In its pre-Hearing Memorandum, Scripps noted that Vallis-Bright

10

"specifically claims she will lose [her home] because of Scripps' conduct if the Court fails to grant relief." (ECF No. 9, PageID 192.) It cited *Botsford v. Bank of Am., N.A.*, No. 13-13379, 2013 WL 5676641, at *1 (E.D. Mich. Oct. 18, 2013) and *Corbitt v. Fed. Nat'l Mortg. Ass'n*, Civil Action 2:15-cv-1725, 2015 WL 4720555, at *3 (S.D. Ohio Aug. 7, 2015), *report and recommendation adopted by* 2015 WL 6942497 (S.D. Ohio Nov. 10, 2015), as examples of courts "valu[ing] the 'amount in controversy' in cases alleging the threatened loss of a home as the value of the property." (ECF No. 9, PageID 191.) And it attached a property record that appears to show that Vallis-Bright's home "was purchased for just over $1 million in 2007, and its current State Equalized Value for property-tax purposes . . . is $484,270— meaning that the true cash value is about $968,000." (ECF No. 9, PageID 191; ECF No. 9-3, PageID 199–200.)

At the Hearing, Scripps conceded that *Botsford* and *Corbitt* involved home foreclosure actions. But there and in its Supplemental Memorandum, Scripps maintained that the Court should consider the value of Vallis-Bright's home, adding that in *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554 (6th Cir. 2010), the Sixth Circuit "h[eld] that the 'value of the requested injunctive relief' to plaintiff . . . was the economic harm to defendant if the Plaintiff was successful." (ECF No. 11, PageID 219) (emphasis removed) (quoting *Cleveland Hous. Renewal Project*, 621 F.3d at 560–61). Scripps also emphasized at the Hearing

that Vallis-Bright "is the master of her Complaint" and specifically chose to bring up her concern over defaulting on her mortgage. This choice, Scripps contended, put the value of Vallis-Bright's home at issue, and established its loss as a likely "consequence" of this case.

Vallis-Bright's pre-Hearing Memorandum asserted that "the value of [her] home is not at issue here and is not the object of this litigation." (ECF No. 10, PageID 214.) Further, at the Hearing, Vallis-Bright argued that the loss of her home would be a "a consequence of a consequence," rather than a first-order consequence, of this dispute.

The Court finds that the value of Vallis-Bright's home has no bearing on the amount in controversy here. "It [has been] well settled" by the Supreme Court "that, when [federal] jurisdiction depends upon the amount in controversy, it is determined by the amount involved in the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur." *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892). While Vallis-Bright's Complaint expresses her fear of losing her home, it ultimately asks for only one thing: a declaration that the Non-Compete does not apply in certain circumstances and "is unreasonable, illegal, void, invalid, and may not be enforced against [her]." (ECF No. 1-1, PageID 16.) Such a declaration would likely bolster Vallis-Bright's ability to earn money, and *that*

would allow her to make mortgage payments, and *that* would empower her to avert the loss of her home. But the declaration would not have anything directly to do with the home.[4] Thus, the possible loss of the home is "a collateral effect [that] does not count toward the amount-in-controversy requirement." *Walker v. ProNational Ins. Co.*, Civil Action No. 12-100-ART, 2012 WL 6060368, at *3 (E.D. Ky. Dec. 5, 2012); *see also* 14AA Charles A. Wright et al., *Federal Practice and Procedure* § 3702.5 n.2 (4th ed.) (updated April 2021) (collecting cases that support the proposition that "whatever the collateral effects a decree or judgment might have by virtue of stare decisis, collateral estoppel, or any other impact on the rights or interests of third parties, those consequences cannot be taken into account in calculating the amount in controversy").

The cases cited by Scripps do not compel a different conclusion. As Scripps admitted at the Hearing, the *Botsford* and *Corbitt* district courts found that the plaintiffs' homes (or mortgages thereon) established the amount in controversy because the plaintiffs filed direct challenges to the defendants' claims to those homes. *See Botsford*, 2013 WL 5676641, at *1; *Corbitt*, 2015 WL 4720555, at *1, 4. In contrast, Scripps has no legal interest in Vallis-Bright's home, and Vallis-Bright has not asked this Court to rule on her own property interests in it.

---

[4] To be sure, Vallis-Bright's home plays a role in her Emergency Motion for Preliminary Injunction. But the inquiry here focuses on Vallis-Bright's Complaint and Scripps' Notice of Removal, not the Emergency Motions that followed.

The Sixth Circuit's decision in *Cleveland Housing* is also inapposite. There, the city-improvement non-profit plaintiff filed for two forms of relief: a declaration that the defendant bank's neglected properties were public nuisances, and an injunction requiring the bank to abate the nuisances or demolish the properties. *Cleveland Hous. Renewal Project*, 621 F.3d at 557, 560. The Sixth Circuit held that the substantial costs that the bank would need to expend to comply with the injunction demonstrated that the injunction would likely also effect city "improvement valued at [more] than $75,000." *Id.* In other words, the injunction required the bank to take actions that would, on their own terms, create over $75,000 in value to the non-profit. Here, on the other hand, the requested declaration would merely affirm Vallis-Bright's right to work near Scripps and solicit its advertisers, customers, and employees. On their own terms, while those rights expand Vallis-Bright's employment and remuneration prospects, they do not entitle her to keep her home.

### 2. Vallis-Bright's sales at Scripps do not establish that the amount in controversy requirement is satisfied.

Next, Scripps contended in its pre-Hearing Memorandum that "[i]n non-competition cases, the Sixth Circuit has held that the 'amount in controversy' may be met by valuing the non-competition agreement, and that may be done through reference to the sales generated by the employee in question, or the future competitive losses to the employer." (ECF No. 9, PageID 189–90.) "Thus," it argued

that, "in *Basicomputer Corp.* [*v. Scott*, 973 F.2d 507 (6th Cir. 1992)], the Sixth Circuit found that the amount-in-controversy requirement was met when the employees 'generated sales worth well over $100,000 per year while they worked for' the employer.'" (ECF No. 9, PageID 190) (quoting *Basicomputer Corp.*, 973 F.2d at 510.) And "[i]n *FirstEnergy Sol*[]*s*[.] *Corp. v. Flerick*, 521 F[.] App'x 521 (6th Cir. 2013)," Scripps continued, "the threshold was met when, in the year preceding the restricted employee's resignation, the employer 'reaped over $300,000 in gross profits based on his sales' and his 'goals evidently required him to produce millions of dollars in revenue each year.'" (ECF No. 9, PageID 190) (quoting *FirstEnergy Sols. Corp.*, 521 F. App'x at 525.) Accordingly, Scripps concluded, there "can be no 'legal certainty' that the amount in controversy is less than $75,000 here," given that Vallis-Bright's "own Complaint alleges that, in just the two months prior to her termination, she generated 'significant sales for Scripps, including, but not limited to, a $325,000 deal,'" and given that Scripps had attached an affidavit from Tony Lamerato, its Senior Director of Revenue Strategy, that "confirms [that Vallis-Bright] generated several hundreds of thousands of dollars in *net profit* in 2021 alone." (ECF No. 9, PageID 190.) (quoting (ECF No. 1-1, PageID 12) and citing (ECF No. 9-2, PageID 197))

At the Hearing, Scripps explained that this approach involves using the sales and revenue that Vallis-Bright generated at Scripps as "a proxy for what is at stake

in the litigation" because the Court must decide whether she can conduct similar work at a competitor, and if she can, she might use her skillset, connections, and "1.8 million dollar" "book of business" to take similar sales away from Scripps. And the "flip side" of any harm she causes Scripps, the company claimed, would be gains she receives at her new employer.

In her pre-Hearing Memorandum, Vallis-Bright responded that Scripps faces no losses because she is "currently unemployed" and "abiding by" the Non-Compete. (ECF No. 10, PageID 213.) She also asserted that "the value of the consequences in this litigation is zero" because if Vallis-Bright wins "she would be allowed the right to work within Metro-Detroit, which has no direct monetary value, and Scripps would not be entitled to enforce an invalid contract – a consequence which also has no monetary value." (ECF No. 10, PageID 214.) At the Hearing, Vallis-Bright contended that the language in Scripps' Executive Agreements nullified the Non-Compete. She also stated that she was challenging only the employment-restriction provision of the Non-Compete, and she assured Scripps and the Court that she would not solicit any of Scripps' clients.

To begin with, the Court declines to find that any part of the Non-Compete is null or invalid; to find otherwise would be to prejudge the outcome of this case. The Court also notes that Vallis-Bright's Complaint asks for a declaration releasing Vallis-Bright from the "Non-Compete," (ECF No. 1-1, PageID 16), a term that it

defines earlier as the entire agreement signed by Vallis-Bright in January of 2020 (ECF No. 1-1, PageID 9), and that it uses in the title of an exhibit that comprises the entire agreement, (ECF No. 1-1, PageID 20–22). Therefore, at this stage of the litigation, the Court will operate under the assumption that Vallis-Bright is asking for relief from the entire Non-Compete, not just the employment restriction provision. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 667 (3d Cir. 2002) ("[T]he amount in controversy must be calculated based on a 'reasonable reading' of the complaint, and a plaintiff's stipulation subsequent to removal as to the amount in controversy or the types of relief sought is of 'no legal significance' to the court's determination."); *Total Quality Logistics, LLC v. Summit Logistics Grp., LLC*, Case No. 1:20-cv-519, 2020 WL 6075712, at *3 n.4 (S.D. Ohio Oct. 14, 2020) ("a plaintiff seeking more than $75,000 in a state court cannot defeat removal by reducing his or demand, once in federal court . . . [b]ut . . . can clarify that he or she has never sought more than $75,000" "if the amount claimed in state court is ambiguous").

The Court finds that Scripps' argument fails, because of the significant differences between this case and *Basicomputer* and *FirstEnergy*. In both *Basicomputer* and *FirstEnergy*, employers brought suit *originally* in federal court for damages and injunctions to enforce non-competition agreements against ex-employees who were allegedly *already* in breach of them. *See Basicomputer Corp.*, 973 F.2d at 508–09; *First Energy Sols. Corp.*, 521 F. App'x at 522–24. From that

posture, *Basicomputer* held that "there [was] no *legal certainty* that Basic's claims [were] worth less than $50,000" because "[e]ach of the defendants generated sales worth well over $100,000 per year while they worked for Basic" and "Basic alleged that it suffered severe competitive losses from . . . the defendants' alleged attempts to lure Basic's clients to [their new employer]." *Basicomputer Corp.*, 973 F.2d at 510 (emphasis added). Similarly, *FirstEnergy* held that, where the "record indicate[d] that in the year preceding Flerick's resignation, FirstEnergy reaped over $300,000 in gross profits based on his sales," it "c[ould] not say *to a legal certainty* that FirstEnergy's claim implicate[d] less than $75,000." *FirstEnergy Sols. Corp.*, 521 F. App'x at 525 (emphasis added).

Those holdings do not require this Court to conclude that Vallis-Bright's equally impressive sales numbers at Scripps prove *by a preponderance of the evidence* that the requested declaration is worth over $75,000 *to her*.

First, Scripps has not shown that it is more likely than not that Vallis-Bright would be able to lure away its advertisers to a different company—with a different product (radio versus television), and an entirely different advertising team. Moreover, unlike the employees in *Basicomputer* and *FirstEnergy*, Vallis-Bright has not yet even attempted to do so.

Second, Scripps has not quantified how harm to it would benefit Vallis-Bright in particular. In *Basicomputer* and *FirstEnergy*, the plaintiffs were companies: so

18

any business that their ex-employees took or would have taken from them directly increased the amount in controversy. But here, the plaintiff is Vallis-Bright as an individual. While business that Vallis-Bright takes from Scripps would directly harm Scripps and benefit Vallis-Bright's new company, it is not clear exactly how much it would benefit Vallis-Bright. Scripps does not predict Vallis-Bright's new commission percentage rate.[5] And it does not speculate about whether a new company would otherwise reward her for actions prohibited by the Non-Compete. *See Chrysler Grp. LLC*, 2015 WL 4429456, at *5 (finding that the Court lacked diversity jurisdiction where "any benefit that would be obtained from the requested injunction is not sufficiently measurable . . . and is far too speculative").

### 3.  Vallis-Bright's projected lost earnings do not exceed the amount in controversy requirement.

Lastly, Scripps argued in its pre-Hearing Memorandum that Vallis-Bright's "actual and anticipated lost wages" satisfy the amount in controversy requirement. (ECF No. 9, PageID 192) (citing *White v. Loomis Armored US, Inc.*, 729 F. Supp. 2d 897, 902 (E.D. Mich. 2010)).

---

[5]  Vallis-Bright's Complaint includes commission rates for salespeople at Scripps, (ECF No. 1-1, PageID 32), but Scripps, which bears the burden of proving the amount in controversy, does not mention these rates. Therefore, the Court has no reason to believe that they reflect the industry standard.
Instead of grappling with commission percentages, Scripps relies on Lamerato's affidavit to estimate Vallis-Bright's commission amount at a new company. The Court analyzes this affidavit in the next section.

Scripps relied in part on Lamerato's affidavit, in which he states, without further explanation, that:

> A General Sales Manager position in the Detroit market area, like the one identified in Audacy's job description, almost certainly would pay a base salary of between $125,000 and $160,000 per year. In addition to base salary, a General Sales Manager would receive commissions based on the activities of her sales team. Even if Ms. Vallis-Bright received the lowest base salary of $125,000 (which is unlikely given her experience) the base salary plus commissions for the Audacy position would almost certainly result in a total annual compensation of $150,000, and very likely more.

(ECF No. 9-2, PageID 198.) Scripps asserted that these numbers establish that "the six-month non-compete alone would prevent [Vallis-Bright] from receiving over $75,000 in salary from Audacy." (ECF No. 9, PageID 192.)  Further, Scripps noted that "the non-solicit term[6] of the contract [Vallis-Bright] seeks to invalidate is one year long, meaning that without the relief requested, her Audacy sales targets (and, thus, commission potential) would continue to be restricted even if she were hired as soon as the six-month non-compete is over." (ECF No. 9, PageID 193.)

In its Supplemental Memorandum, Scripps also argued that "without [a declaration], Audacy might hire someone else . . . , meaning [Vallis-Bright] will lose that [job's] significant salary in perpetuity, not just for a few months." (ECF No. 11,

---

[6] This term prohibits Vallis-Bright from "interfere[ing] with, disturb[ing] or interrupt[ing] the relationships . . . of [Scripps] . . . with any user, advertiser, customer, supplier, or consultant." (ECF No. 1-1, PageID 21)

PageID 220.) And at the Hearing, Scripps emphasized that "there is no allegation that without [] relief she will still obtain the job just four months from now."

Vallis-Bright argued in her pre-Hearing Memorandum that "any potential wages are not the 'value of the object of the litigation,' as [her] earnings are not the subject of the litigation – the validity of the Non-Compete is the <u>sole</u> object of this litigation." (ECF No. 10, PageID 214.) But if the Court does consider her potential wages, she added, then it should only consider three months of them, because "only three months remain on the Non-Compete." (ECF No. 10, PageID 215.) Vallis-Bright did not challenge the reliability of Lamerato's affidavit.

The Court must examine whether "the allegations in the complaint *at the time of removal* satisfy the amount-in-controversy requirement." *Northup Props., Inc.*, 567 F.3d at 769–70 (emphasis added). On February 3, when this case was removed, the Non-Compete's employment restriction was set to lapse in four months and its non-solicitation restriction was set to lapse in ten months.[7] (ECF No. 1-1, PageID 10–12, 21.)

Scripps has not proven by a preponderance of the evidence that a declaration voiding these restrictions is worth more than $75,000 to Vallis-Bright. Because it assumed that the Court should value the entire six months of the employment

---

[7] The Court recognizes that the Non-Compete also has a confidentiality clause without any time restriction. (ECF No. 1-1, PageID 21.) But neither party has offered any evidence or even speculation on this clause's potential individual value.

restriction, Scripps did not explain how the remaining *four* months left on that restriction, plus an additional six months of solicitation restriction, add up to the required amount. And in fact, Lamerato's affidavit appears to suggest that they do not.[8]

Finally, despite Scripps' argument at the Hearing, the Court will not consider Vallis-Bright's post-Non-Compete-expiration earnings. The amount in controversy

---

[8] The Court reads Lamerato's affidavit (ECF No. 9-2) as follows:

- Lamerato estimates that Vallis-Bright's new job "almost certainly would pay a base salary of between $125,000 and $160,000 per year." For the sake of argument, the Court will assume that it is more likely than not that Vallis-Bright's new salary would fall in the middle of that range, and therefore be **$142,500** per year.
- Lamerato also states that, if Vallis-Bright received a base salary of $125,000 a year, commission would "almost certainly" bring her "total annual compensation" up to $150,000, and "very likely more." Therefore, he suggests that Vallis-Bright would "very likely" receive more than **$25,000** per year in commission at her new job. (And as the Court noted earlier, Scripps has not provided any other future commission estimates.)
- Together, these terms suggest that Vallis-Bright would earn a "total projected salary" of "more than" **$167,500** per year.
- The four-month employment restriction would deprive Vallis-Bright of one-third of that total annual salary, or "more than" **$55,833.33**.
- Scripps also argued that the non-solicitation term "would continue to [] restrict[]" Vallis-Bright's "sales targets (and, thus, commission potential)" for six more months "even if she were hired as soon as the six-month non-compete is over." (ECF No. 9, PageID 193). If the Court assumes that the non-solicitation term is so powerful that it would block *all* of Vallis-Bright's commission during those additional six months—and it very likely would not—then that would deprive Vallis-Bright of another "more than" **$12,500**.
- In total, then, this generous reading of Lamerato's affidavit suggests that the remaining time on the Non-Compete is likely worth "more than" **$68,333.33**—not that it is likely worth more than $75,000.

22

must "be determined . . . with a focus on the economic value of the rights [Vallis-Bright] seeks to protect." *Smith*, 505 F.3d at 407. These are the rights to work at a competitor to Scripps in the four months after removal, and to solicit its affiliates in the ten months after removal. *Cf. Total Quality Logistics, LLC*, 2020 WL 6075712, at *4 (suggesting that, where a company sues to enforce a Non-Compete, the Court would consider "the value of [the] prospective injunction *for any remaining non-compete period* under the agreement," and noting that "covenants . . . [that] appear to have *no expiration date* . . . could well have forward-looking value no matter how much time elapses" (emphasis added)). The consequences of those rights upon later employment opportunities are collateral to Vallis-Bright's claim for relief. She is not seeking a declaration about her right to work anywhere after the Non-Compete ends. And, unlike the plaintiffs in *White*, she is not asking for the right to work anywhere indefinitely. *Cf. White*, 729 F.Supp.2d at 903 (suggesting that the Court could "calculat[e] future wages" to "approximate the value of [an] injunction" that would restore plaintiffs to their previous employment, without any time-limitation).

**CONCLUSION**

"In the interest of comity and federalism, federal jurisdiction should be exercised only when it is clearly established, and any ambiguity regarding the scope of § 1446(b) should be resolved in favor of remand to the state courts." *Tigrett*, 2021

WL 1156626, at *8 (citing *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 534 (6th Cir. 1999)). Because Scripps has not proven by a preponderance of the evidence that the over $75,000 amount in controversy requirement is satisfied, this Court does not have jurisdiction to hear this case. Accordingly, the Court **REMANDS** the case to the Circuit Court for the County of Oakland. And the Court **DENIES AS MOOT** the outstanding Motions for a Preliminary Injunction (ECF No. 3) and for Emergency Discovery (ECF No. 7).

This Opinion and Order is not a decision on the merits.

**IT IS SO ORDERED.**

Dated: February 22, 2022                    s/Paul D. Borman
       Detroit, Michigan                     Paul D. Borman
                                      United States District Judge